[No. S126664. Feb. 5, 2007.]

Conservatorship of the Person of BEN C.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Petitioner and Respondent, v.
BEN C., Objector and Appellant.

532

534

**COUNSEL**

Diane Nichols, under appointment by the Supreme Court, and Robert L. Visnick, under appointment by the Court of Appeal, for Objector and Appellant.

Cheryl A. Geyerman for Appellate Defenders, Inc., as Amicus Curiae on behalf of Objector and Appellant.

John J. Sansome, County Counsel, Thomas E. Montgomery, Assistant County Counsel, Leonard W. Pollard II and William A. Johnson, Jr., Deputy County Counsel, for Petitioner and Respondent.

**OPINION**

**CORRIGAN, J.**—In an indigent criminal defendant's first appeal as a matter of right, the Court of Appeal must independently review the record if appointed counsel represents he or she has found no arguable issues. (*Anders v. California* (1967) 386 U.S. 738 [18 L.Ed.2d 493, 87 S.Ct. 1396] (*Anders*); *People v. Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071] (*Wende*).) We here consider whether the federal or California Constitution requires *Anders/Wende* procedures in an appeal from the imposition of a conservatorship under the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.).[1] We conclude neither Constitution so requires and we decline to extend the procedures under our inherent authority.

### I. FACTUAL AND PROCEDURAL BACKGROUND

It is undisputed that appellant Ben C. suffers from a bipolar schizoaffective disorder. Evidence below established that he believed his food was being poisoned, causing his mental problems. As a consequence, he refused to eat and lost 21 pounds in a month. He also refused to take his antipsychotic medications, assaulted his father and grandmother, experienced hallucinations, masturbated publicly, and sexually assaulted female staff and patients.

After a bench trial, the court found that appellant was gravely disabled by a mental disorder and thus unable to provide for his basic needs. A conservatorship of his person was reestablished, and the least restrictive level of placement available was found to be a closed, locked treatment facility. (§§ 5008, subd. (h)(1)(A), 5350.)

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

Appointed counsel advised the Court of Appeal he found no issues to raise. Citing *Anders, supra*, 386 U.S. 738, and *Wende, supra*, 25 Cal.3d 436, he asked the court to independently review the record. The Court of Appeal appointed new counsel and requested briefing on the applicability of the *Anders/Wende* procedures to conservatorship proceedings under the LPS Act.

The Court of Appeal held the *Anders/Wende* procedures inapplicable, declined independent review, and affirmed the judgment. We affirm the judgment of the Court of Appeal.

## II. DISCUSSION

■ In *Anders, supra*, 386 U.S. 738, the United States Supreme Court addressed the responsibilities of court and counsel when counsel concludes there are no meritorious issues in a criminal defendant's first appeal as a matter of right. "[I]f counsel finds his case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw. That request must, however, be accompanied by a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court—not counsel— then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous. If it so finds it may grant counsel's request to withdraw and dismiss the appeal insofar as federal requirements are concerned, or proceed to a decision on the merits, if state law so requires. On the other hand, if it finds any of the legal points arguable on their merits (and therefore not frivolous) it must, prior to decision, afford the indigent the assistance of counsel to argue the appeal." (*Id.* at p. 744.)[2]

■ *Wende, supra*, 25 Cal.3d 436, provided a gloss on *Anders, supra*, 386 U.S. 738. "The *Wende* court . . . stated its view that, even if counsel believes the appeal to lack any basis in law or fact, he need not move to withdraw so long as he (1) does not advise the court of his belief and thereby disqualify himself, and (2) informs the defendant that he may request the court to relieve him if he so desires." (*Sade C., supra*, 13 Cal.4th at p. 980.)

First, we turn to the question whether *Anders, supra*, 386 U.S. 738, is *directly* applicable in LPS Act conservatorship appeals. In *Pennsylvania v. Finley* (1987) 481 U.S. 551 [95 L.Ed.2d 539, 107 S.Ct. 1990] (*Finley*), the

---

[2] In *In re Sade C.* (1996) 13 Cal.4th 952 [55 Cal.Rptr.2d 771, 920 P.2d 716] (*Sade C.*), we recognized that "since the day it was decided, *Anders* has been subjected to 'consistent and severe criticism.' (Note, *The Right to Counsel in 'Frivolous' Criminal Appeals: A Reevaluation of the Guarantees of* Anders v. California (1988) 67 Tex. L.Rev. 181, 212.) That criticism, of course, does not affect its authority." (*Id.* at p. 979, fn. 7.)

high court declined to extend *Anders* to collateral attacks upon criminal convictions. The court noted that its cases "establish that the right to appointed counsel extends to the first appeal of right, and no further." (*Finley*, at p. 555.) If a defendant "has no underlying constitutional right to appointed counsel," the defendant cannot "insist on the *Anders* procedures which were designed solely to protect that underlying constitutional right." (*Id.* at p. 557.)

█ Following the reasoning of *Finley, supra,* 481 U.S. 551, we held in *Sade C., supra,* 13 Cal.4th 952, that the *Anders* procedures do not apply to an indigent parent's appeal from a juvenile court decision affecting child custody or parental status. (*Id.* at p. 959.) "By its very terms, *Anders*'s 'prophylactic' procedures are limited in their applicability to appointed appellate counsel's representation of an indigent *criminal defendant*—and there only in his first appeal as of right. An indigent parent adversely affected by a state-obtained decision on child custody or parental status is simply not a criminal defendant. Indeed, the proceedings in which he is involved must be deemed to be civil in nature and not criminal." (*Id.* at p. 982.)

█ By the same reasoning, the *Anders/Wende* procedures are not required in appeals from LPS conservatorship proceedings. The conservatee is not a criminal defendant and the proceedings are civil in nature. (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1008 [36 Cal.Rptr.2d 40, 884 P.2d 988] (*Susan T.*).)

Relying primarily on *Conservatorship of Roulet* (1979) 23 Cal.3d 219 [152 Cal.Rptr. 425, 590 P.2d 1] (*Roulet*), appellant argues that *Anders, supra,* 386 U.S. 738, should nevertheless be *extended* to such appeals. In *Roulet*, this court held that "[t]he due process clause of the California Constitution requires that proof beyond a reasonable doubt and a unanimous jury verdict be applied to conservatorship proceedings under the LPS Act." (*Roulet*, at p. 235.) The rationale for the decision was that "[t]he appointment of a conservator for appellant and her subsequent confinement in a mental hospital against her will deprived appellant of freedom in its most basic aspects and placed a lasting stigma on her reputation." (*Id.* at p. 223.) The court rejected the respondent's "reliance on a civil label." (*Id.* at p. 225.) "[R]espondent takes false comfort in the fact that appellant's commitment is only a 'civil' confinement for remedial purposes. However, these are mere labels. Appellant's stay in Camarillo State Hospital was not any less involuntary because the state called her incarceration by one name rather than another. As the United States Supreme Court has authoritatively written, 'commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil." ' (*In re Gault* (1967) 387 U.S. 1, 50 [18 L.Ed.2d

527, 87 S.Ct. 1428].) In a subsequent opinion, the Supreme Court reiterated that 'civil labels and good intentions do not themselves obviate the need for criminal due process safeguards . . . .' (*In re Winship* (1970) 397 U.S. 358, 365–366 [25 L.Ed.2d 368, 90 S.Ct. 1068].)" (*Roulet*, at pp. 224–225.)

More recently this court has recognized, however, that the analogy between criminal proceedings and proceedings under the LPS Act is imperfect at best and that not all of the safeguards required in the former are appropriate to the latter. In *Susan T.*, *supra*, 8 Cal.4th 1005, we held that the exclusionary rule does not apply in LPS proceedings. "We find no similarity between the aims and objectives of the act and those of the criminal law. What we have said of commitment proceedings for the mentally retarded (§§ 6500–6513) is equally true of conservatorship proceedings under the act: 'The commitment is not initiated in response, or necessarily related, to any criminal acts; it is of limited duration, expiring at the end of one year and any new petition is subject to the same procedures as an original commitment [citation]; the petitioner need not be a public prosecutor . . . . The sole state interest, legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community. The commitment may not reasonably be deemed punishment either in its design or purpose. It is not analogous to criminal proceedings.' [Citations.]" (*Susan T.*, at p. 1015.) As the United States Supreme Court has observed: " '[T]he mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment.' [Citation.] . . . If detention for the purpose of protecting the community from harm *necessarily* constituted punishment, then all involuntary civil commitments would have to be considered punishment. But we have never so held." (*Kansas v. Hendricks* (1997) 521 U.S. 346, 363 [138 L.Ed.2d 501, 117 S.Ct. 2072] [involuntary confinement under Kansas's Sexually Violent Predator Act not being punitive, double jeopardy and ex post factor principles held inapplicable].)

The salient question here is whether the absence of the *Anders/Wende* procedures significantly increases the risk of erroneous resolutions. As we explain below, it does not. (See *Sade C.*, *supra*, 13 Cal.4th at pp. 990–991.)

Concluding that the federal due process clause did not compel the extension of *Anders, supra*, 386 U.S. 738, the *Sade C.* court tracked the analysis in *Lassiter v. Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153] (*Lassiter*). *Lassiter* held that the Fourteenth Amendment's due process clause did not give an indigent parent the right to appointed trial

counsel in a state-initiated proceeding on parental status. Both courts balanced three factors: "(1) the private interests at stake; (2) the state's interests involved; and (3) the risk that the absence of the procedures in question will lead to an erroneous resolution of the appeal." (*Sade C., supra,* 13 Cal.4th at p. 987.)

The competing private interests at stake in *Sade C.* were those of the indigent parent and his child. The parent has a liberty interest in the care, custody, and rearing of his child. The child has a liberty interest in a stable family home. Both have an interest in the accurate and just resolution of the parent's appeal. (*Sade C., supra,* 13 Cal.4th at pp. 987–989.) The state has several interests: promoting the welfare of the child, securing a just appellate resolution, reducing procedural costs and burdens, and concluding the proceedings both fairly and expeditiously. (*Id.* at pp. 989–990.)

We concluded in *Sade C.* that the absence of the *Anders* procedures would not significantly raise the risk of an erroneous appellate resolution. "[O]ur consideration of the many cases that have come before us on petition for review reveals that appointed appellate counsel faithfully conduct themselves as active advocates in behalf of indigent parents." (*Sade C., supra,* 13 Cal.4th at p. 990.) The experience of Division One of the Fourth Appellate District of the Court of Appeal confirmed this conclusion. (*Ibid.*) In *In re Brian B.* (1983) 141 Cal.App.3d 397 [190 Cal.Rptr. 153] and *In re Joyleaf W.* (1984) 150 Cal.App.3d 865 [198 Cal.Rptr. 114], that court had applied *Anders* procedures to appeals from the termination of parental rights under the juvenile court law. However, having followed the procedures for more than a decade, it reassessed its position: "[W]e have discovered, to the best of our present recollection, no unbriefed issues warranting further attention." (*In re Angelica V.* (1995) 39 Cal.App.4th 1007, 1015 [46 Cal.Rptr.2d 295].) Accordingly, it concluded the procedures were "unproductive" (*id.* at p. 1016) and overruled *Brian B.* and *Joyleaf W.* (*Angelica V.,* at p. 1012.)

After balancing the interests of the parent, child, and state, *Sade C.* held that due process does not compel an extension of *Anders*'s procedures to appeals regarding cases of child custody or parental status. "Procedures that are practically 'unproductive,' like those in question, need not be put into place, no matter how many and how weighty the interests that theoretically support their use." (*Sade C., supra,* 13 Cal.4th at pp. 990–991.)

A similar analysis supports the conclusion that neither federal nor state due process guarantees compel an extension of *Anders/Wende* to conservatorship appeals.

 The LPS Act promotes a variety of private and public interests. Among its goals are "ending the inappropriate and indefinite commitment of the mentally ill, providing prompt evaluation and treatment of persons with serious mental disorders, guaranteeing and protecting public safety, safeguarding the rights of the involuntarily committed through judicial review, and providing individualized treatment, supervision and placement services for the gravely disabled by means of a conservatorship program. (§ 5001.)" (*Susan T., supra*, 8 Cal.4th at p. 1009.) The Act also serves to protect the mentally ill from criminal victimization (§ 5001, subd. (g)) and from the myriad forms of suffering endured by those unable to care for themselves.

The liberty interests at stake in a conservatorship proceeding are significant. A person found to be gravely disabled may be involuntarily confined for up to one year, and the conservatorship may be extended for additional one-year periods, so long as the person remains gravely disabled. (§ 5361.) In addition to physical restraint, "[t]he gravely disabled person for whom a conservatorship has been established faces the loss of many other liberties . . . ." (*Roulet, supra*, 23 Cal.3d at p. 227.)[3] Moreover, a person suffering from a grave mental disorder is obviously in a poor position to influence or monitor counsel's efforts on his behalf. Accordingly, the Legislature and this court have built several layers of important safeguards into conservatorship procedure. These safeguards are extensive and designed to serve all three of the *Lassiter/Sade C.* considerations. (See *Sade C., supra*, 13 Cal.4th at p. 987.)

---

[3] Section 5357 provides: "All conservators of the estate shall have the general powers specified in Chapter 6 (commencing with Section 2400) of Part 4 of Division 4 of the Probate Code and shall have the additional powers specified in Article 11 (commencing with Section 2590) of Chapter 6 of Part 4 of Division 4 of the Probate Code as the court may designate. The report shall set forth which, if any, of the additional powers it recommends. The report shall also recommend for or against the imposition of each of the following disabilities on the proposed conservatee:

"(a) The privilege of possessing a license to operate a motor vehicle. If the report recommends against this right and if the court follows the recommendation, the agency providing conservatorship investigation shall, upon the appointment of the conservator, so notify the Department of Motor Vehicles.

"(b) The right to enter into contracts. The officer may recommend against the person having the right to enter specified types of transactions or transactions in excess of specified money amounts.

"(c) The disqualification of the person from voting pursuant to Section 2208 of the Elections Code.

"(d) The right to refuse or consent to treatment related specifically to the conservatee's being gravely disabled. The conservatee shall retain all rights specified in Section 5325.

"(e) The right to refuse or consent to routine medical treatment unrelated to remedying or preventing the recurrence of the conservatee's being gravely disabled. The court shall make a specific determination regarding imposition of this disability.

"(f) The disqualification of the person from possessing a firearm pursuant to subdivision (e) of Section 8103."

■ Before a person may be found to be gravely disabled and subject to a year-long confinement, the LPS Act provides for a carefully calibrated series of temporary detentions for evaluation and treatment. "The act limits involuntary commitment to successive periods of increasingly longer duration, beginning with a 72-hour detention for evaluation and treatment (§ 5150), which may be extended by certification for 14 days of intensive treatment (§ 5250); that initial period may be extended for an additional 14 days if the person detained is suicidal. (§ 5260.) . . . [T]he 14-day certification may be extended for an additional 30-day period for further intensive treatment. (§ 5270.15.) Persons found to be imminently dangerous may be involuntarily committed for up to 180 days beyond the 14-day period. (§ 5300.) After the initial 72-hour detention, the 14-day and 30-day commitments each require a certification hearing before an appointed hearing officer to determine probable cause for confinement unless the detainee has filed a petition for the writ of habeas corpus. (§§ 5256, 5256.1, 5262, 5270.15, 5275, 5276.) A 180-day commitment requires a superior court order. (§ 5301.)" (*Susan T., supra*, 8 Cal.4th at p. 1009.)

■ This series of temporary detentions may culminate in a proceeding to determine whether the person is so disabled that he or she should be involuntarily confined for up to one year. (§§ 5350, 5361.) Because of the important liberty interests at stake, correspondingly powerful safeguards protect against erroneous findings. "The proposed conservatee is entitled to demand a jury trial on the issue of his or her grave disability, and has a right to counsel at trial, appointed if necessary. (§§ 5350, 5365.) The party seeking imposition of the conservatorship must prove the proposed conservatee's grave disability beyond a reasonable doubt and the verdict must be issued by a unanimous jury. (*Conservatorship of Roulet*[, *supra*,] 23 Cal.3d 219.)" (*Susan T., supra*, 8 Cal.4th at p. 1009.)

During a one-year conservatorship, a conservatee may twice petition for rehearing. (§ 5364.)[4] At a rehearing, a conservatee need only prove by a preponderance of the evidence that he or she is no longer gravely disabled. (*Conservatorship of Everette M.* (1990) 219 Cal.App.3d 1567, 1573 [269 Cal.Rptr. 182]; *Baber v. Superior Court* (1980) 113 Cal.App.3d 955, 966 [170 Cal.Rptr. 353].) The matter is tried by the court (*People v. Tilbury* (1991) 54 Cal.3d 56, 64 [284 Cal.Rptr. 288, 813 P.2d 1318]; *Baber*, at pp. 960–965), and the conservatee again has a right to appointed counsel (§§ 5364, 5365).

---

[4] Section 5364 provides in pertinent part: "At any time, the conservatee may petition the superior court for a rehearing as to his status as a conservatee. However, after the filing of the first petition for rehearing pursuant to this section, no further petition for rehearing shall be submitted for a period of six months."

■ A conservatorship automatically terminates at the end of a year. (§ 5361.) If the conservator seeks a one-year extension, "[t]he petition must include the opinion of two physicians or licensed psychologists who have a doctoral degree in psychology and at least five years of postgraduate experience in the diagnosis and treatment of emotional and mental disorders that the conservatee is still gravely disabled . . . ." (*Ibid.*) At a hearing to reestablish a conservatorship after its automatic expiration, the standard of proof beyond a reasonable doubt and the rights to appointed counsel, to a court or jury trial, and to a unanimous jury verdict again apply. (§§ 5350, subd. (d), 5365; *Conservatorship of Guerrero* (1999) 69 Cal.App.4th 442, 446 [81 Cal.Rptr.2d 541]; *Conservatorship of Delay* (1988) 199 Cal.App.3d 1031, 1036–1037, fn. 6 [245 Cal.Rptr. 216].)

■ Finally, in an appeal of a conservatorship, the conservatee is entitled to the appointment of counsel, as occurred in this case. The rules of court also create safeguards to ensure active advocacy on appeal. A Court of Appeal must now evaluate an attorney's qualifications for appointment, divide its appointments list into at least two levels based on experience and qualifications, match an attorney with the demands of the case, and review and evaluate the performance of appointed counsel to determine whether they should remain on the list at the same level, be placed on a different level, or be deleted from the list. (Cal. Rules of Court, rule 8.300.)[5]

■ If a conservatorship is sustained on appeal, all safeguards remain in effect. The conservatorship still automatically expires at the end of a year. If a conservator seeks a new one-year commitment, the conservator again bears the burden of proof beyond a reasonable doubt. The conservatee again has the rights to appointed counsel, a jury trial, and a unanimous verdict. If the conservatorship is reestablished, the conservatee has renewed rehearing and appellate rights.

■ By establishing the layers of protections described, the Legislature, this court, and the Judicial Council have vigilantly guarded against erroneous conclusions in conservatorship proceedings. These procedures reflect an extension of many safeguards also afforded to criminal defendants, while

---

[5] Appellant asserts there are fewer conservatorship appeals than parental rights termination appeals. Based on this assertion, he argues that we should assume that counsel in the latter perform less well than counsel in the former. Even assuming that conservatorship appeals are less common, it does not follow that appellate counsel in conservatorship matters perform *incompetently*. Any concerns about counsel's competence would most directly be addressed by further refining the process for appointing and training counsel. It would not be to "require an appellate court to abandon its traditional role as an adjudicatory body and to enter the appellate arena as an advocate." (*Wende, supra,* 25 Cal.3d at pp. 443–444 (dis. opn. of Clark, J.).) The roles of court and counsel in our adversary system are carefully delimited. We confuse them at our peril.

taking into account the essential differences between the two systems. Ordinarily, once a criminal judgment and sentence are final, the trial court loses jurisdiction to correct error. (But see Pen. Code, § 1170, subd. (d).) The criminal defendant's only recourse then is to the courts of review. The LPS scheme is quite different because of the one-year limit on commitments and the ability of the conservatee to return twice to the trial court for reconsideration during that 12-month period.

As a result, the trial court's ongoing supervision remains focused on a conservatee's current needs and condition, in a manner quite different from that followed in a criminal context. Allowing continuing trial court attention ensures much more direct and appropriate intervention. It strikes the *Lassiter/Sade C.* balance in a qualitatively different way. It provides the conservatee with a more immediate avenue for modification than that afforded by the more cumbersome appellate review. And it keeps the focus primarily on the conservatee's current needs and progress, rather than on a retrospective consideration of conditions that may no longer exist. For all these reasons we conclude that the current approach provides a panoply of safeguards appropriately geared to the specific goals and interests involved. The extension of *Anders/Wende* is thus not required.

Appellant's equal protection claim rests on the premise that criminal defendants and LPS conservatees are similarly situated. The premise fails. Criminal defendants face punishment, but an LPS commitment " 'may not reasonably be deemed punishment either in its design or purpose.' " (*Susan T.*, *supra*, 8 Cal.4th at p. 1015.)

Finally, appellant urges us to extend *Anders/Wende* procedures under our inherent power to declare rules of California appellate procedure. We decline to do so. Both the individual and the community have a profound interest in the calibrated and appropriate treatment of those who suffer from grave mental impairment. While placement in a secure setting is a burden on freedom, it is imposed, on a time-limited basis, to protect both the patient and his neighbors. Society has an obligation to ensure that freedom is not impinged upon unnecessarily or for an inappropriate period. The extensive framework of modulated intervention, under the supervision of both mental health professionals and the courts, has been created to provide that assurance. Adding yet another layer of review would be an undue expansion in cases that have been so extensively supervised, under the full panoply of protections afforded by jury trial, proof beyond a reasonable doubt, and the assistance of at least two appointed counsel. We decline to extend a system of review that is not constitutionally compelled and that we, ourselves, have recognized has been subject to " 'consistent and severe criticism' " from its inception. (*Sade C.*, *supra*, 13 Cal.4th at p. 979, fn. 7.)

■ We offer the following guidance for the Courts of Appeal. If appointed counsel in a conservatorship appeal finds no arguable issues, counsel need not and should not file a motion to withdraw. Instead, counsel should (1) inform the court he or she has found no arguable issues to be pursued on appeal; and (2) file a brief setting out the applicable facts and the law.[6] Such a brief will provide an adequate basis for the court to dismiss the appeal on its own motion.[7] Dismissal of an appeal raising no arguable issues is not inconsistent with article VI, section 14 of the California Constitution requiring that decisions determining causes "be in writing with reasons stated."[8] Nothing is served by requiring a written opinion when the court does not actually decide any contested issues.

■ We disapprove *Conservatorship of Margaret L.* (2001) 89 Cal.App.4th 675 [107 Cal.Rptr.2d 542] and *Conservatorship of Besoyan* (1986) 181 Cal.App.3d 34 [226 Cal.Rptr. 196] insofar as they held that *Anders/Wende* procedures apply to appeals in conservatorship proceedings under the LPS Act.

### III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

Baxter, J., Werdegar, J., and Chin, J., concurred.

**GEORGE, C. J.,** Dissenting.—In this case, we address whether independent review is required in an appeal from the imposition of a conservatorship under the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.;

---

[6] The conservatee is to be provided a copy of the brief and informed of the right to file a supplemental brief.

[7] The court may, of course, find it appropriate to retain the appeal.

[8] In *Sade C., supra,* 13 Cal.4th 952, we stated that the Court of Appeal did not err in dismissing the appeals as abandoned. "A 'reviewing court has inherent power, on motion or its own motion, to dismiss an appeal which it cannot or should not hear and determine.' (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 508, p. 494.) An appealed-from judgment or order is presumed correct. (E.g., *Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) Hence, the appellant must make a challenge. In so doing, he must raise claims of reversible error or other defect (see *ibid.*), and 'present argument and authority on each point made' (*County of Sacramento* v. *Lackner* (1979) 97 Cal.App.3d 576, 591 [159 Cal.Rptr. 1]; accord, *In re Marriage of Ananeh-Firempong* (1990) 219 Cal.App.3d 272, 278 [268 Cal.Rptr. 83]). If he does not, he may, in the court's discretion, be deemed to have abandoned his appeal. (*Berger* v. *Godden* [(1985)] 163 Cal.App.3d [1113,] 1119 [210 Cal.Rptr. 109].) In that event, it may order dismissal. (*Ibid.*) Such a result is appropriate here. With no error or other defect claimed against the orders appealed from, the Court of Appeal was presented with no reason to proceed to the merits of any unraised 'points'—and, a fortiori, no reason to reverse or even modify the orders in question. (See *People* v. *Brigham* (1979) 25 Cal.3d 283, 289 [157 Cal.Rptr. 905, 599 P.2d 100].) [Fn. omitted.]" (*Id.* at p. 994.)

LPS Act). It is undisputed that the private interests at stake are of the most fundamental nature, as the conservatee may be subjected to restraints upon physical freedom and personal autonomy for lengthy periods, and may be denied other basic civil rights as well. It also is undisputed that the state's interest in avoiding the additional procedure of independent review is essentially nonexistent. The only remaining consideration is the risk that the absence of independent review will lead to an erroneous decision. The majority concludes that procedural safeguards afforded a conservatee *in the trial court* establish that independent review is unnecessary on appeal. As explained below, because it is not apparent that appointed appellate counsel have acted as active advocates in matters such as this and that errors have not been overlooked on appeal, independent review is required pursuant to the analysis established by our decision in *In re Sade C.* (1996) 13 Cal.4th 952 [55 Cal.Rptr.2d 771, 920 P.2d 716] (*Sade C.*).

## I.

The procedure that Ben seeks to have applied in the present case was established by *Anders v. California* (1967) 386 U.S. 738 [18 L.Ed.2d 493, 87 S.Ct. 1396], in which the United States Supreme Court concluded that "[t]he constitutional requirement of substantial equality and fair process can only be attained where counsel acts in the role of an active advocate in behalf of his client, as opposed to that of amicus curiae." (*Id.* at p. 744.) Therefore, when appointed appellate counsel for a criminal defendant determines that the appeal is wholly frivolous, counsel must file "a brief referring to anything in the record that might arguably support the appeal. A copy of counsel's brief should be furnished the indigent and time allowed him to raise any points that he chooses; the court—not counsel—then proceeds, after a full examination of all the proceedings, to decide whether the case is wholly frivolous." (*Ibid.*) In *People v. Wende* (1979) 25 Cal.3d 436 [158 Cal.Rptr. 839, 600 P.2d 1071] (*Wende*), this court approved a modified procedure (*Anders/Wende*) pursuant to which counsel files a brief summarizing the proceedings and facts with citations to the record, and the appellate court conducts a review of the entire record to determine whether there is any arguable issue. (*Id.* at p. 441.)

*Sade C.*, *supra*, 13 Cal.4th 952, addressed whether the *Anders/Wende* procedures should be extended to a parent who has a constitutional right to the appointment of appellate counsel in a parental rights termination proceeding. (*Id.* at p. 986.) To resolve this issue, the court applied the mode of analysis set out in *Lassiter v. Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153] (*Lassiter*). As explained in *Lassiter*, the "three elements to be evaluated in deciding what due process requires [are]

the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions." (*Id.* at p. 27.) *Sade C.*'s analysis of these three elements provides a model that is helpful in comparing the interests at stake in LPS Act appeals.

Our opinion in *Sade C.* began with an analysis of the private interests of the parent and the child. The parent has a fundamental liberty interest in the care, custody, and management of his or her child, and a derivative liberty interest in the accurate and just resolution of the parent's appeal from the termination of parental rights. Although these interests arguably would receive greater protection if independent review were required, "the appealed-from decision, which is adverse to the parent and is predicated on detriment he caused or allowed his child to suffer, is presumptively accurate and just. [Citation.]" (*Sade C., supra,* 13 Cal.4th at p. 988.) The child has an interest in a " 'normal family home' " or at least a " 'stable' " home, and this interest has been characterized as " 'important' " and " 'compelling.' " (*Ibid.*) The child also has a derivative liberty interest in an accurate and just resolution of the parent's appeal, but in view of the presumption that the judgment based on a finding of detriment to the child is accurate and just, there is a further presumption that "the wants and needs of parent and child are *inconsistent.*" (*Id.* at p. 989.)

The state has an " 'urgent' " interest in preserving and promoting the welfare of the child, and an " 'important' " interest in an accurate and just resolution of the parent's appeal. (*Sade C., supra,* 13 Cal.4th at p. 989.) It also "has a 'fiscal and administrative interest in reducing the cost and burden of [the] proceedings.' [Citations.]" (*Ibid.*) Its concern with expense is merely " 'legitimate,' " but its concern with prompt resolution is more important. (*Id.* at p. 990.) "Proceedings such as these 'must be concluded as rapidly as is consistent with fairness . . . .' [Citation.] A 'period of time' that 'may not seem . . . long . . . to an adult . . . can be a lifetime to a young child.' [Citation.]" (*Ibid.*) To the extent the application of *Anders/Wende* procedures delays resolution of the appeal, their application conflicts with the interests of the child, but to the extent they promote an accurate and just resolution, they promote the child's interests. Because the judgment is presumptively correct, however, the child's welfare presumptively "lies with someone *other than* his parent." (*Ibid.*)

Finally, with respect to the risk that the absence of *Anders/Wende* review will lead to an erroneous resolution of the appeal, the court observed in *Sade C.* that "our consideration of the many cases that have come before us on petition for review reveals that appointed appellate counsel faithfully

conduct themselves as active advocates in behalf of indigent parents. . . . In accord is the experience of Division One of the Fourth Appellate District of the Court of Appeal, as it recently recounted in *In re Angelica V.* Having applied the procedures in question for more than a decade . . . , the court declared that 'we have discovered, to the best of our present recollection, *no* unbriefed issues warranting further attention.' (*In re Angelica V.* [(1995)] 39 Cal.App.4th [1007,] 1015 [46 Cal.Rptr.2d 295], italics added.)" (*Sade C.,* *supra,* 13 Cal.4th at p. 990.) Because the court determined that *Anders/Wende* procedures would be " 'unproductive,' " it further concluded that they "need not be put into place, no matter how many and how weighty the interests that theoretically support their use. To be sure, these procedures may have 'symbolic' value of some kind. [Citation.] Such value, however, is too slight to compel their invocation." (*Id.* at pp. 990–991, fn. omitted.)

## II.

### A.

The private interests at stake in an LPS conservatorship proceeding are greater than those involved in a parental rights termination proceeding and in some respects are more significant than the interests of a defendant facing criminal charges. The circumstance that the conservatee may be civilly confined in a mental institution rather than criminally incarcerated does not alter the " ' " 'massive curtailment of liberty' " ' " entailed by involuntary restraint. (*Conservatorship of Roulet* (1979) 23 Cal.3d 219, 224 [152 Cal.Rptr. 425, 590 P.2d 1].)[1] Not only may a conservatee be confined involuntarily, he

---

[1] The majority appears to acknowledge that the civil nomenclature and altruistic intentions that characterize conservatorship proceedings do not mitigate the ensuing drastic impingement on a conservatee's civil rights, but suggests that our opinion in *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005 [36 Cal.Rptr.2d 40, 884 P.2d 988] reflects an acknowledgement that civil and criminal detainment are different in nature. (Maj. opn., *ante,* at pp. 537–538.) This suggestion ignores the specific and limited issue resolved in that case. *Susan T.* decided only that the exclusionary rule does not apply in LPS proceedings, because the purpose of the rule—deterring future unlawful police conduct—is not served in the context of such cases. A mental health worker's concern is focussed on protecting the potential conservatee, not on gathering evidence to secure a conviction. Not only would the deterrent effect of applying the exclusionary rule in LPS proceedings be marginal at best, application of the rule would frustrate the purposes of evaluating and treating gravely disabled persons. (*Susan T.,* at p. 1019.) *Susan T.* did not suggest that the private interests at stake in LPS proceedings are any less fundamental or that the potential curtailment of such interests in those proceedings is any less massive than was recognized in *Conservatorship of Roulet.* Thus, it is irrelevant to the analysis in this case that the conservatee may be confined for reasons other than punishment. (See *Conservatorship of Roulet, supra,* 23 Cal.3d at p. 227 ["mere fact that appellant found herself confined in a hospital rather than a prison does not eliminate the need to protect her against *false* confinement"]; *Conservatorship of Joel E.* (2005) 132 Cal.App.4th 429, 438 [33 Cal.Rptr.3d 704] [explaining that criminal procedures have been afforded when the interest at

or she may lose numerous civil rights, including the right to manage money, property, and litigation, the right to decide whether to take medication or to receive medical treatment, the right to vote, the right to remain licensed to practice a profession, and the right to enter into contracts. (*Conservatorship of Roulet, supra*, 23 Cal.3d at pp. 227–228.)[2] Moreover, a conservatee suffers the stigma of the adjudication. "It is indisputable that commitment to a mental hospital 'can engender adverse social consequences to the individual' and that '[w]hether we label the phenomena "stigma" or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual.' [Citations.]" (*Vitek v. Jones* (1980) 445 U.S. 480, 492 [63 L.Ed.2d 552, 100 S.Ct. 1254]; see also *Conservatorship of Roulet, supra*, 23 Cal.3d at pp. 228–229.) Finally, "these statutes assure in many cases an unbroken and indefinite period of state-sanctioned confinement. 'The theoretical maximum period of detention is *life* as successive petitions may be filed . . . .' [Citation.]" (*Conservatorship of Roulet, supra*, 23 Cal.3d at p. 224.)

Not only are the private interests involved greater than those in other cases, but all of the private interests weigh in favor of affording additional review of the proceedings—unlike the situation where a child may be awaiting resolution of his or her status and is being denied a final, stable placement, or where a crime victim seeks a prompt resolution of the appeal. Because there is no party (other than the conservatee) whose interest is affected by the rebuttable presumption that the judgment is correct, that presumption is irrelevant to the analysis in this context. (See *Sade C., supra*, 13 Cal.4th at p. 990 [because judgment terminating parental rights is presumptively correct, a child's welfare presumptively lies with someone other than the parent].)

B.

Regarding the second due process factor, the state shares the conservatee's interest in a correct adjudication. (See Welf. & Inst. Code, § 5001 [legislative intent to end the inappropriate, indefinite, and involuntary commitment of mentally disordered persons].) Although the state has a countervailing interest

---

issue is false confinement, and that "when the rights at issue do not bear on the accuracy of the results, courts have not extended criminal procedural protections to civil commitment proceedings"].)

[2] The court's order that Ben be placed in a closed locked treatment facility further provided, among other matters, that he "[s]hall not have the right to refuse or consent to routine medical treatment and medication *unrelated* to remedying or preventing the recurrence of the conservatee's grave disability." (Italics added.) As noted at oral argument, Ben is not allowed to make the decision whether to ingest a tablet of aspirin.

in avoiding the expense of additional procedures, this interest has been described as "hardly significant" and merely "legitimate." (*Lassiter, supra,* 452 U.S. at p. 28; see *Sade C., supra,* 13 Cal.4th at p. 990.) In the context of evaluating whether independent review should be required in appeals in conservatorship proceedings under the LPS Act, it appears that *no* pecuniary interest of the state is implicated. According to a declaration submitted by Appellate Defenders, Inc., from January 1, 2001, through March 2004 when this case was briefed in the Court of Appeal, counsel had been appointed in only 14 LPS appeals in the entire Fourth Appellate District, and *Wende* briefs had been filed in only two of those appeals, including the instant matter. The Court of Appeal for the Fourth Appellate District handles approximately one-quarter of all of the contested matters filed in California's six Courts of Appeal, so if its experience is typical, a total of approximately eight *Wende* briefs would have been filed in all of the Courts of Appeal during that three-year period. Even if a *Wende* brief had been filed in every LPS appeal in which counsel was appointed, only 14 *Wende* briefs would have been filed in the Fourth Appellate District during those years.

In addition, the appeals themselves require minimal time to review, because they arise from proceedings that are neither lengthy nor complex. As Justice Crosby noted in *Conservatorship of Margaret L.* (2001) 89 Cal.App.4th 675, 682 [107 Cal.Rptr.2d 542], "We did not find it too burdensome under these circumstances to expend two or three hours to review this sparse record for arguable issues. Such cases, after all, terrorize us with the prospect of extra work about as often as newly discovered asteroids threaten to collide with Earth." Not only are the records short,[3] but the legal issues presented—whether proper procedures were followed and whether sufficient evidence supports the findings—are relatively simple. The Courts of Appeal had 21,901 contested filings in fiscal year 2004–2005. (Judicial Council of Cal., 2006 Court Statistics Rep., p. 24, available online at <www.courtinfo.ca.gov/reference/documents/factsheets/Calif__Juducial__Branch.pdf> [as of Feb. 5, 2007].) Thus, our Courts of Appeal clearly possess the resources available to perform the negligible additional amount of work required in these very few conservatorship cases. Finally, as county counsel noted at oral argument, *Wende* appeals do not impose any burden upon the county agency. Not surprisingly, the county did not file arguments in opposition to providing *Wende* review in these cases until the Court of Appeal and this court directed it to respond. It also is no surprise that in the 20 years since *Conservatorship of Besoyan* (1986) 181 Cal.App.3d 34 [226 Cal.Rptr. 196], held that *Wende* review must be provided

---

[3] In the present case, the clerk's transcript is 68 pages and the reporter's transcript is 174 pages.

in LPS appeals, there has been no indication that our Courts of Appeal are overburdened with those cases.

## C.

With respect to the third due process factor—the risk of error if independent review is not afforded—we have no means by which to determine whether appointed appellate counsel generally have been conducting themselves as active advocates or whether errors are being overlooked on appeal.[4] We do not know in how many cases independent review has been performed, but apparently the number is quite small. We also do not know in how many of these cases additional briefing has been ordered to address issues overlooked by counsel. Moreover, even if supplemental briefing never has been ordered, the number of LPS appeals in which a *Wende* brief has been filed does not provide a statistically significant number of cases upon which to base any conclusions as to the overall performance of appointed counsel or the likelihood that errors may be overlooked.

Not only does the paucity of LPS appeals preclude a determination of whether counsel in practice have overlooked arguable issues, but that scarcity of cases even prevents counsel from specializing in this area of law. In contrast, counsel who handle appeals in criminal or juvenile cases have the opportunity to develop expertise in those areas.[5] In addition, the client in an LPS proceeding is presumably less capable than a criminal defendant or a parent of monitoring and assisting his or her counsel's efforts in the case, and has no access to a law library or even a jailhouse lawyer. Moreover, the evidence in an LPS case involves expert testimony that often will be beyond the understanding of the conservatee, in contrast to the evidence in a criminal case or a parental rights termination proceeding, which typically will focus on actions and events with which the litigants are familiar. As a result, LPS appeals are prosecuted by attorneys with little experience in this area of the

---

[4] The majority opinion characterizes the third factor as whether the absence of the additional procedures "significantly increases the risk of erroneous resolutions." (Maj. opn., *ante*, at p. 538.) Neither *Lassiter* nor *Sade C.* requires a "significant" increase in the risk. Rather, consistent with the concept of balancing factors, the risk of error, whatever its weight in a particular context, is added to the other factors that support the additional procedures, and together they are balanced against the factors that disfavor additional procedures.

[5] According to statistics gathered by the Administrative Office of the Courts, of the 21,901 contested matters filed in the Courts of Appeal in fiscal year 2004–2005, 11,501, or approximately half, were criminal matters, and 3,317, or approximately 15 percent, were juvenile matters. (Judicial Council of Cal., 2006 Court Statistics Rep., *supra*, at p. 24, available at <www.courtinfo.ca.gov/reference/documents/factsheets/Calif__Judicial__Branch.pdf> [as of Feb. 5, 2007].)

law on behalf of clients who are in no position to monitor or assist counsel. The most knowledgeable resource for evaluating these appeals resides within the Courts of Appeal—the justices and their experienced staff who handle all LPS appeals, whether prosecuted by appointed or retained counsel.[6]

### III.

The majority relies upon various statutory safeguards that apply to trial court proceedings to support its conclusion that independent review would not uncover errors. Procedural safeguards governing trial court proceedings were relevant in *Lassiter* because the court was considering the likelihood that errors would occur in the trial court absent the appointment of *trial counsel* for the parent. (*Lassiter, supra*, 452 U.S. at pp. 28–29.) The issue in the present case is not whether further procedures are required in the trial court; it is whether, as a general matter, experience establishes that appointed appellate counsel will act as active advocates on appeal and identify all arguable issues. The provision of roughly equivalent procedural protections in the trial of criminal cases did not lead the high court to conclude in *Anders* that independent review is unnecessary. Extensive procedural safeguards also are provided in trial court proceedings involving the termination of parental rights, including representation by counsel at each stage of the proceedings, notice of all hearings and advisement of rights, the requirement of clear and convincing evidence to justify removal of a child from custody, six-month review hearings at which there is a rebuttable presumption that the child should be returned to the parent, a right to seek modification of an order at any time based on changed circumstances, and a right to appeal almost every order. (See *In re Marilyn H.* (1993) 5 Cal.4th 295, 307–308 [19 Cal.Rptr.2d 544, 851 P.2d 826]; Welf. & Inst. Code, §§ 366.21, 366.26, subd. (*l*), 388, 395.) These statutory safeguards played no part in our analysis in *Sade C.*

---

[6] According to the majority, "[a]ny concerns about counsel's competence would most directly be addressed by further refining the process for appointing and training counsel. It would not be to 'require an appellate court to abandon its traditional role as an adjudicatory body and to enter the appellate arena as an advocate.' (*Wende, supra*, 25 Cal.3d at pp. 443–444 (dis. opn. of Clark, J.).) The roles of court and counsel in our adversary system are carefully delimited. We confuse them at our peril." (Maj. opn., *ante*, at p. 542, fn. 5.)

This argument is a challenge to independent review in any context. We might just as well ask, why not provide lawyers with better training and then assume they always will act as active advocates and never overlook errors? Not only is this approach inconsistent with *Anders, Wende,* and *Sade C.*, it assumes that enhanced training of appellate counsel appointed in these cases necessarily will ensue. The majority also fails to explain what "peril" may follow from directing the Courts of Appeal to give these cases a second look. It is indisputable that LPS appeals are rare, and this fact supports an inference that counsel in these cases are not as experienced or competent in their appointed area of law as are counsel who routinely handle appeals from criminal convictions and the termination of parental rights.

Instead, we relied upon the circumstance that *numerous* cases involving the termination of parental rights had received independent review, and that experience had established that, as a general matter, "appointed appellate counsel faithfully conduct themselves as active advocates in behalf of indigent parents." (*Sade C., supra,* 13 Cal.4th at p. 990.) We have no such experience or evidence in the context of LPS appeals.

Our review of criminal convictions and cases involving the termination of parental rights, both of which arise from proceedings in which numerous procedural safeguards are provided, does not suggest that procedural safeguards in the trial court preclude the occurrence of errors requiring correction on appeal. On the contrary, the numerous existing procedural requirements and restrictions sometimes give rise to a greater potential for error. If the LPS Act is to fulfill its purpose of protecting individuals from inappropriate confinement, it is imperative that our appellate courts be able to ensure that its procedures are being followed.

Not only are the safeguards provided in the Act not failsafe, most of those noted by the majority are irrelevant to a conservatee like Ben who already has been involuntarily confined for a significant period. The "carefully calibrated series of temporary detentions for evaluation and treatment" (maj. opn., *ante,* at p. 541) occurred two years before the recommitment proceeding at issue in this case, and provide no assurance that his recommitment was error free or that his appellate attorney provided active advocacy. At the point at which the conservatee may be committed or recommitted for a year, he or she is entitled to counsel, a unanimous jury verdict, and proof beyond a reasonable doubt—a situation very similar to that facing a criminal defendant, who then will be accorded *Anders/Wende* review on appeal.

The majority implicitly recognizes that statutory safeguards do not prevent the commission of errors in the trial court. Instead, the majority concludes that independent review is not required in these cases, because the trial court must from time to time reexamine the propriety of the conservatorship and, the majority speculates, the trial court will correct any errors in the proceedings. According to the majority, "[t]he LPS scheme is quite different because of the one-year limit on commitments and the ability of the conservatee to return twice to the trial court for reconsideration during that 12-month period. [¶] As a result, the trial court's ongoing supervision remains focused on a conservatee's current needs and condition, in a manner quite different from that followed in a criminal context. Allowing continuing trial court attention ensures much more direct and appropriate intervention. It strikes the *Lassiter/Sade C.* balance in a qualitatively different way. It provides the

conservatee with a more immediate avenue for modification than that afforded by the more cumbersome appellate review. And it keeps the focus primarily on the conservatee's current needs and progress, rather than on a retrospective consideration of conditions that may no longer exist." (Maj. opn., *ante*, at p. 543.)

The majority's view that resort to the trial court for relief is superior to appellate review assumes that contentions actually are raised in the trial court during the year of the conservatorship, that the trial court will not repeat former errors, and that independent review is cumbersome. There is no basis for any of these assumptions. We do not know whether appointed trial counsel routinely file petitions for rehearing during the year of the conservatorship. Moreover, in contrast to petitions for commitment or recommitment, which must be filed and proved by the public guardian, petitions for rehearing must be brought by the conservatee and will be denied unless the conservatee proves that he or she is not gravely disabled. (*Conservatorship of Everette M.* (1990) 219 Cal.App.3d 1567, 1572 [269 Cal.Rptr. 182].) Thus, while these proceedings provide an opportunity for the conservatee—if the conservatee's appointed counsel is inclined to pursue such a proceeding—to attempt to prove that he or she is not gravely disabled, they are not a promising means by which to establish that the trial court has erred in its handling of the case. It seems more likely that a trial court would apply a consistent rule or approach in such cases and leave it to the appellate court to correct the trial court if it is wrong. Therefore, appellate review of the propriety of the initial proceedings appears to be a more efficient and effective means to correct trial court error.

The majority's characterization of conservatorship proceedings as not retrospective ignores the statutory requirement that the trial court consider the history of the mental illness (Welf. & Inst. Code, § 5008.2 [historical course of person's mental disorder shall be considered when that course has a direct bearing upon the determination of whether the person is a danger or is gravely disabled]), and is belied by the record in the present case.[7] In contrast to a criminal conviction and sentence, a commitment under the LPS Act may be extended repeatedly, based in large part upon the same evidence and inferences that supported the original judgment. (See *Kansas v. Hendricks* (1997) 521 U.S. 346, 369 [138 L.Ed.2d 501, 117 S.Ct. 2072] [commitment as

---

[7] The forensic psychiatrist who testified on behalf of the county in this case stated it is important to rely upon the records and history of the individual's mental illness. The psychiatrist, who testified in 2003, relied upon records prepared by an individual who did not become involved in Ben's case until 2001 or 2002, but whose records were the source of information concerning Ben's behavior in 1998, when his symptoms first appeared.

sexually violent predator is not for the purpose of punishment and therefore does not violate double jeopardy clause]; *Conservatorship of Baber* (1984) 153 Cal.App.3d 542, 549–550 [200 Cal.Rptr. 262] [doctrine of double jeopardy does not apply in conservatorship proceedings].) Because these proceedings build upon past adjudications, it is important that errors in earlier proceedings be corrected on appeal so that erroneous prior factfinding or procedures are not repeated and do not affect future adjudications. Affording independent review in no way will diminish or interfere with the procedural safeguards that apply in the trial court.

In summary, none of the procedural safeguards provided in the trial court ensures that counsel will act as an active advocate on appeal, that appellate counsel will not overlook errors, or that errors will be corrected in the trial court before the case reaches the appellate court. Just as the procedural safeguards afforded in criminal trials and proceedings involving the termination of parental rights provide no basis upon which to conclude there is no risk that errors will be overlooked absent independent review, these safeguards do not afford a basis for concluding there is no risk that errors will be overlooked in LPS cases. In light of what is at stake—fundamental interests of the individual, the state's strong interest in ensuring an accurate result, the lack of any burden on the state in affording independent review, and the lack of any reassurance that appellate counsel consistently have acted as active advocates and do not overlook errors on appeal (or that trial courts routinely correct errors as they preside over LPS proceedings)—the analysis we set forth in *Sade C., supra,* 13 Cal.4th 952, compels the conclusion that independent review is required in LPS appeals when appointed appellate counsel is unable to identify an arguable issue on appeal.

## IV.

I note that despite the majority's conclusion that *Anders/Wende* review is not warranted in these cases, the majority nonetheless requires counsel to file a brief setting out the applicable facts and law and to provide a copy to the conservatee, and affords the conservatee a right to file a supplemental brief. It is unclear from the majority opinion what the Court of Appeal is expected to do after it receives such a brief and any supplemental contentions. Presumably, the majority contemplates that someone within the appellate court— evidently a judicial staff attorney working under the direct guidance of a justice, or perhaps a central staff attorney working under similar guidance— will review counsel's brief and any contentions submitted personally by the conservatee. Thereafter, to enable a panel of justices to determine whether it

would be appropriate to retain the appeal (maj. opn., *ante*, p. 544, fn. 7), the briefs and related information and analysis must be conveyed to the justices. Accordingly, it appears that the majority has decided to exercise this court's supervisory powers to impose upon the Courts of Appeal all of the *Anders/Wende* procedures except the requirement that the appellate court review the record.

All that remains to be done in order to provide independent review is for the Court of Appeal to confirm that proper procedures were followed and that the order is supported by sufficient evidence. With counsel's brief as a guide, and a short record, it should be an easy task to make these determinations. In light of the massive curtailment of liberty that may be imposed in an LPS case, this court should exercise its supervisory powers to impose this negligible additional burden upon the Courts of Appeal in order to ensure that the rights of these vulnerable litigants are protected and that the Legislature's objective of preventing the inappropriate, indefinite, and involuntary commitment of mentally disordered persons is achieved. (See Welf. & Inst. Code, § 5001.)

### V.

The only remaining point to consider is whether the appeal should be resolved by way of a written opinion in the absence of any arguable issue to be decided. Contrary to the majority's assertion that "[n]othing is served by requiring a written opinion when the court does not actually decide any contested issues" (maj. opn., *ante*, at p. 544), very real interests are met by rendering a brief opinion in an LPS appeal. This court has recognized "the important due process interest in recognizing the dignity and worth of the individual by treating him as an equal, fully participating and responsible member of society. [Citations.] . . . Thus, even in cases in which the decision-making procedure will not alter the outcome of governmental action, due process may nevertheless require that certain procedural protections be granted the individual in order to protect important dignitary values, or, in other words, 'to ensure that the method of interaction itself is fair in terms of what are perceived as minimum standards of political accountability—of modes of interaction which express a collective judgment that human beings are important in their own right, and that they must be treated with understanding, respect, and even compassion.' [Citation.]" (*People v. Ramirez* (1979) 25 Cal.3d 260, 267–268 [158 Cal.Rptr. 316, 599 P.2d 622].)

In responding to the assertion of a mentally disordered individual that he or she should be free of constraints under the LPS Act, our judicial system

should provide more than an order summarily dismissing his or her appeal as frivolous or abandoned. Our Courts of Appeal should demonstrate appropriate recognition of the interests of these individuals by undertaking the minimal effort required to inform the conservatee that the court has reviewed the record and that specified evidence in the record supports the trial court's order.

Unlike an opinion in a criminal appeal, which serves various institutional purposes even if no arguable issue is identified (see *People v. Kelly* (2006) 40 Cal.4th 106 [51 Cal.Rptr.3d 98, 146 P.3d 547]), the opinion in an LPS appeal in which no arguable issue is identified primarily will serve the interest of responding to the conservatee in a dignified and accountable manner. Therefore, a typical opinion in such a case will be very brief. In some cases, however, further comment will be appropriate. An important function of an appellate opinion in an LPS case is to communicate to the trial court any concerns the Court of Appeal may have, even if those concerns do not rise to the level of an arguable issue. For example, in this case Ben was provided with an interpreter after he stated that he understood only half of what was being said and that he needed an interpreter. Thereafter, when Ben's counsel examined him, counsel asked the judge to allow the examination to proceed without an interpreter, stating that "[Ben's] going to have to deal with the world, the outside world, outside of [the locked facility]. He's going to have to speak English, he's going to have to be able to begin to communicate with people." The examination and cross-examination of Ben took place without an interpreter. Ben then stated again that he understood only half of what the judge and counsel were saying, and that he needed an interpreter. An interpreter was provided for the remainder of the proceeding. Although these events may not give rise to an arguable issue in the context of the present case, it would be appropriate for the appellate court to note in its opinion that an individual need not be fluent in the English language in order to avoid confinement in a mental institution under these circumstances, and that an interpreter should be provided to Ben in future conservatorship proceedings.

## VI.

The majority's holding that independent review is not constitutionally required in LPS appeals in no way prevents the Courts of Appeal from expending the minimal effort required to provide these appeals with a second look and to provide an opinion that briefly notes the court has reviewed the record and that identifies the findings and evidence supporting the order. (See *Lassiter, supra,* 452 U.S. at p. 33 ["wise public policy . . . may require that

higher standards be adopted than those minimally tolerable under the Constitution"].) I encourage the Courts of Appeal to expend the few hours required in these rare cases to ensure that conservatees are not inappropriately confined, and to treat these individuals in a considerate and compassionate manner rather than summarily informing them that their appeals are frivolous and have been abandoned.

Kennard, J., and Moreno, J., concurred.