Filed 4/24/23 Conservatorship of J.G. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Conservatorship of the Person of J.G. | A165316 |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY, | (Contra Costa County Super. Ct. No. MSP-10-00060) |
|     Plaintiff and Respondent, | |
| v. | |
| J.G., | |
|     Defendant and Appellant. | |

After a jury found that she continued to be gravely disabled, J.G. appealed from the superior court's order reappointing the Public Guardian of Contra Costa County (Public Guardian) as the conservator of her person pursuant to the Lanterman-Petris-Short Act (LPS Act).[1] J.G.'s appellate counsel filed an opening brief raising no arguable issues and asking this court to exercise its discretion to independently review the record (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*)) or, "at a minimum," to conduct the level of review prescribed for conservatorship matters in *Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 544 & fn. 6 (*Ben C.*). In accordance with *Ben C.*, J.G.

---

[1] Welfare and Institutions Code, section 5000 et seq. All section references are to the Welfare and Institutions Code unless otherwise specified.

1

was provided with a copy of the opening brief and informed of her right to file a supplemental brief; she has not done so.

As appellate counsel acknowledges, a *Wende* review is only available in a first appeal of right from a criminal conviction. (*Ben C., supra*, 40 Cal.4th at pp. 543–544; *People v. Serrano* (2012) 211 Cal.App.4th 496, 501; *People v. Taylor* (2008) 160 Cal.App.4th 304, 312.) However, we have recently dismissed three prior appeals in this matter as moot. (*Conservatorship of J.G.* (Aug. 24, 2022, A162724) [dism. ord.]; *Conservatorship of J.G.* (Aug. 18, 2021, A160321) [unpub. opn.]; *Conservatorship of J.G.* (July 6, 2020, A157322) [dism. ord.].) Given the "private interests at stake" and the "restraints upon physical freedom and personal autonomy" at issue, we have conducted a *Wende* review in this instance. (*Ben C.*, at p. 545 (dis. opn. of George, C.J.), pp. 543–544, fn. 7.) Our independent review of the record having disclosed no arguable issues, we affirm the reappointment order.

## BACKGROUND

J.G. (born in 1975) has been conserved since 2010. Prior to that time, she had over 210 mental health contacts with Contra Costa County. She began abusing drugs at 13 years of age, including crack, methamphetamine, LSD, alcohol, and marijuana. J.G. is wheelchair bound due to hip dysplasia from a car accident, which complicates her level of care. On February 25, 2022, the Public Guardian filed a petition for reappointment as conservator for J.G. under the LPS Act. In April 2022, J.G. requested a jury trial to determine whether she remained gravely disabled. The evidence adduced at the trial—held over two days on May 23 and 24, 2022—included the following:

Andrew Bove testified as the deputy conservator assigned to J.G's case for the past five months. When Mr. Bove visited J.G., she admitted to

2

hearing menacing voices at her current and previous facility, including "voices belonging to others outside of herself in the walls of the facility" and voices "crying out over and over black magic witchcraft." She also exhibited drug-seeking behavior. J.G. did not believe she had a psychotic problem. She stated she may have a split personality— referencing being a Gemini—and admitted possibly being bipolar and possibly being schizophrenic when under the influence of LSD. In Mr. Bove's opinion, J.G. did not have a viable plan for food, clothing, or shelter if released. For instance, she planned to make money as a model and with her writings and artwork, which he did not find feasible. During the course of their conversation, J.G.'s thoughts would wander and break off onto unrelated topics. This attribute made it difficult for her to organize her thoughts or execute a plan towards a particular goal.

Dr. Michael Levin testified, over objection, as an expert in psychiatry and grave disability. Although he had no specific certifications or formal training in forensic psychiatry, he had worked for Contra Costa County evaluating individuals for grave disability since 2013, had testified as an expert in conservatorship matters approximately 200 times, and had been involved as an evaluator in J.G.'s case four or five times since 2015. At his most recent meeting with J.G.—the week before trial—she exhibited a lack of insight into the extent of her mental illness. While acknowledging that "maybe" she had a psychiatric disorder, "people had told her maybe it was bipolar," which she explained meant "she would pick up another person's personality." J.G. also exhibited mood instability and reactivity, which could lead to emotional outbursts and yelling. Her records were "replete" with such instances. Finally, J.G. had trouble making decisions and dealing with reality testing, which manifested as J.G. being unable to "assess what is real and what is fantasy."

Dr. Levin opined that J.G. suffered from schizoaffective disorder and polysubstance abuse. He testified regarding a number of her recent drug-seeking behaviors. As an example, in January 2022, J.G. went to the nursing station and asked that the doctor be called for Ativan, methadone, and codeine. When she was offered an authorized anti-anxiety medication instead, she refused and had an outburst, banging the door with her wheelchair, yelling, cursing, and making a throat-cutting gesture while stating she would kill the staff member. With respect to her schizoaffective disorder, J.G. was taking three antipsychotic medications, a mood stabilizer, a sleep medication, and a medication for side effects. Nevertheless, she continued to exhibit symptoms of mental illness. According to Dr. Levin, J.G.'s records show that "she needs not only supervision, but that she needs prompting to be compliant with her medication."

Dr. Levin testified that J.G.'s mental illness would negatively impact her ability to procure and maintain shelter, both because she would have a "hard time making a specific decision" and because her emotional dysregulation would make it difficult for her to interact appropriately with others when seeking a room. If J.G. were to stop taking her medication, it "would make things even more difficult and worse" to maintain shelter. Dr. Levin concluded that J.G. remained gravely disabled, noting that "her presentation [was] consistent over the past six or seven years" and that "[s]he really has not progressed or changed or improved over that period of time."

J.G. also testified, stating concerns about being given certain medications and not having access to others. For example, she testified: "I'm not supposed to be taking it, lithium, and my weight gain picked up. They are illegally taking my blood twice a week. They may be selling my blood or doing something with it because every week they are taking tubes of blood,

4

and I feel like I'm getting weak." She was in pain and wanted to ask the judge to write her an order for Suboxone, which she described as "almost like a non-narcotic because it's a synthetic opiate." She claimed that Dr. Levin tried to "murder" her with "dangerous pills." Further, J.G. could not articulate a clear plan for shelter. She did not have anyone that she could stay with and wanted to go to a board and care facility. On rebuttal, Dr. Levin testified that he saw at least three different symptoms of schizoaffective disorder in J.G.'s testimony: loose associations, where thought processes become very tangential; delusions, such as the selling of her blood; and paranoid ideations, including her statement that he was trying to harm her with drugs when he was not even her prescribing psychiatrist.

After argument, the jury found J.G. to be gravely disabled. The court then imposed, over objection, the requested special disabilities, limiting J.G.'s ability to possess firearms and to refuse treatment and medication with respect to her grave disability. Finally, the court heard from J.G. regarding her desire to be placed in a board and care facility. Thereafter, the court designated J.G.'s current level of placement—a skilled nursing facility with specialized treatment program—as the least restrictive placement for her. This timely appeal followed.

## DISCUSSION

Having reviewed the entire record, we have found no arguable issues that require further briefing. In particular, substantial evidence supports the jury's finding of grave disability. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011; *Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123, 134; see also *Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 165–166 [evidence supporting grave disability finding also supported order imposing

special disabilities].) Additionally, J.G. was at all times ably represented by competent counsel who protected her rights and interests.

## DISPOSITION

The reappointment order is affirmed.

SWOPE, J.*

WE CONCUR:


HUMES, P. J.


MARGULIES, J.


A165316N

---

* Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.