Filed 8/3/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| Conservatorship of the Person of K.W. | |
| CHRISTINE KOPER, as Public Conservator, etc., <br><br>      Petitioner and Respondent, <br><br> v. <br><br> K.W., <br><br>      Objector and Appellant. | A148614 <br><br> (Sonoma County <br> Super. Ct. No. SPR-87836) |

The Sonoma County Public Conservator (Conservator) petitioned under the provisions of the Lanterman-Petris-Short Act (LPS Act) (Welf. & Inst. Code, § 5000 et seq.)[1] for appointment as conservator of the person for appellant K.W. The petition alleged K.W. was gravely disabled due to a mental disorder, unable to provide for his basic needs for food, clothing, or shelter, and incapable of accepting treatment voluntarily. After a May 2015 hearing, the court granted the petition for an initial one-year term.

The Conservator petitioned for reappointment in April 2016, alleging K.W. remained gravely disabled and unable to care for his own needs. K.W. demanded a jury trial. The jury found him gravely disabled due to mental disorder, and the court reappointed the Conservator for an additional one-year term.[2] K.W. challenges the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] We have been advised by counsel that a subsequent petition for reappointment of conservatorship was filed in April 2017, and that in June 2017, a jury found K.W. gravely disabled and the new petition was granted. The Conservator has moved to dismiss the

1

continued conservatorship, contending that the trial court erred in permitting the jury to consider case-specific hearsay testimony from an expert witness. We find any error to be harmless and affirm.

## I.    BACKGROUND

K.W.'s LPS conservatorship was established following a contested bench trial in May 2015. Psychiatrist Gary Bravo, M.D., testified he had diagnosed K.W. with a bipolar schizoaffective disorder and opined that K.W. had severe problems with impulse control, had a denial of his illness and need for medications, and could not independently provide for his food, clothing and shelter because of his illness. The court found K.W. to be gravely disabled and appointed the Conservator for a one-year term.[3]

The Conservator petitioned for reappointment (§ 5361) in April 2016. K.W. requested a jury trial, which commenced and concluded on May 31, 2016. Bravo, who was board certified by the American Board of Psychiatry and Neurology, testified as an expert in forensic psychiatry. He served as a consulting member of K.W.'s treatment team, and consulted about appropriate placements and services for K.W. As part of his pretrial evaluation of K.W., Bravo conducted a 50-minute face-to-face interview with K.W. Bravo also had interviewed K.W. in connection with prior conservatorship evaluations and was "pretty familiar" with him. Bravo personally observed K.W. when he was a patient at the county's psychiatric emergency facilities. In addition to personal observations, Bravo relied on medical records from the Sonoma County Behavioral Health Department, and medical records from the locked Santa Cruz facility (7th Avenue Center) where K.W. was receiving treatment. Bravo also spoke to K.W.'s former

---

appeal as moot. We deny the motion. Although K.W.'s challenge to the prior confinement order may be technically moot, we exercise our discretion to decide this case because it raises important issues that are capable of repetition but, due to the comparatively short duration of LPS commitments, are likely to evade review. (*Conservatorship of John L.* (2010) 48 Cal.4th 131, 142, fn. 2.)

[3] K.W. filed a petition for rehearing (§ 5364), which was ultimately denied on February 25, 2016.

2

outpatient psychiatrist, and with a social worker acting as a liaison for patients at the 7th Avenue Center.

In addition to his own observations, Bravo testified concerning "information about [K.W.'s] past and his functioning in other settings" provided by "other people." This information, obtained from historical reports and medical records, included allegations that K.W. was evicted from a room and board facility for causing a fire by leaving cooking items on a hot stove; spent money recklessly; engaged in altercations with others by insulting or provoking them, resulting in his expulsion from a psychiatric facility; and inappropriately touched female residents at a psychiatric facility where he had been confined.

Bravo diagnosed K.W. as suffering from a schizoaffective disorder and identified his "main symptoms" as "disorganized thinking and behaviors" resulting in lack of impulse control, impaired judgment, and "paranoid and grandiose" delusions. Bravo said the delusions caused K.W. to "think his capabilities are better than they actually are . . . ." Bravo opined that K.W. lacked insight into his mental illness and the impact of that illness on his behaviors and ability to provide for himself. While K.W. exhibited better insight than in the past, Bravo said K.W. "still has a way to go in the realm of insight." Bravo opined that K.W met the criteria for grave disability criteria established in the LPS Act and was unable to care for himself. In Bravo's opinion, K.W. would return to San Francisco or Los Angeles if not conserved, and he would become homeless and, eventually, return to a psychiatric facility or jail.

K.W. testified and acknowledged he suffered from schizoaffective and bipolar disorders, as well as diabetes. He identified his prescribed medications and said he would continue to take them if released. He denied refusing medication while hospitalized. If released, K.W. said he would seek emergency psychiatric care if necessary. He had $3,000 in a personal bank account and received $890 each month in Supplemental Security Income, which was managed by a designated representative payee. K.W. said he knew how to cook, named grocery stores where he would do his food shopping, knew of a free soup kitchen and "pantries in the neighborhood that

3

offer gourmet, free bags of groceries" if he were to run out of money. He had adequate clothing but would go to Goodwill for clothing if necessary. K.W said he would be able to live with friends or at a shelter or "easily rent an apartment on their Section 8 housing list that I'm on, or stay at Redwood Gospel for a night." When asked if he could take care of himself, K.W. insisted: "I have ever since I left my parents' home in '86. It's very simple for me. It's not a complicated issue. I have done very well."

K.W. was examined about an incident in which he "jumped out of [a] van" while being transported in San Francisco. K.W said he was "just visiting" a friend. He initially denied having a criminal record but then admitted a "domestic incident" involving his brother. He admitted to an April 2016 altercation at the 7th Avenue Center. K.W. said he had been struck by another person, but denied hitting back, saying he only put his fist up "[i]n defiance" and "[i]n protest." Asked if he made comments that tended to incite other people, K.W. maintained he "might comment on what they are doing or how I perceive they're doing it wrong or a small, constructive criticism." He insisted he would not hit anyone if released from conservatorship.

The jury found K.W. was gravely disabled due to a mental disorder. Based on that finding, the court ordered reestablishment of the conservatorship.

## II.    DISCUSSION

Under the LPS Act, a conservator may be appointed "for a person who is gravely disabled as a result of a mental disorder . . . ." (§ 5350.) " 'Gravely disabled' " is defined as, inter alia, "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).) Under section 5350, subdivision (e)(1), "a person is not 'gravely disabled' if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic personal needs for food, clothing, or shelter." "The clear import of the LPS Act is to use the involuntary commitment power of the state sparingly and only for those truly necessary cases where a 'gravely disabled' person is incapable of

4

providing for his basic needs either alone or with help from others." (*Conservatorship of Smith* (1986) 187 Cal.App.3d 903, 908.)

" '[T]o establish that a person is gravely disabled, the evidence must support an objective finding that the person, due to mental disorder, is incapacitated or rendered unable to carry out the transactions necessary for survival or otherwise provide for his or her basic needs of food, clothing, or shelter,' and the public guardian must prove beyond a reasonable doubt that the proposed conservatee is gravely disabled. [Citation.] On appeal, we apply the substantial evidence test to determine whether the record supports the court's finding of grave disability. The testimony of one witness may be sufficient to support such a finding." (*Conservatorship of Jesse G.* (2016) 248 Cal.App.4th 453, 460–461.)

K.W. does not challenge the sufficiency of evidence actually presented to the jury to establish grave disability. Rather, he argues the trial court erred in permitting case-specific hearsay evidence in support of expert opinion of his disability, in violation of the rule articulated by our Supreme Court in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). He contends that the rule of *Sanchez* must be applied retroactively to his case.

A.      Sanchez

Expert testimony may be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions. (Evid. Code, § 801, subd. (b).) "So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily *inadmissible* can form the proper basis for an expert's opinion testimony." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 (*Gardeley*), disapproved in other respects by *Sanchez, supra,* 63 Cal.4th at p. 686, fn. 13.) At the time of K.W.'s trial, *Gardeley* was controlling authority. *Gardeley* further permitted a qualified expert witness to testify on direct examination to any sufficiently reliable hearsay sources used in formulation of the expert's opinion. (*Gardeley*, at p. 618 ["because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such

inadmissible matter can, when testifying, describe the material that forms the basis of the opinion."]; *People v. Dodd* (2005) 133 Cal.App.4th 1564, 1569.) When such testimony was presented, a jury, as here, received a limiting instruction advising it to consider hearsay statements only to evaluate the expert's opinion and not to consider those statements as proof that the information contained in the statements was true. (CACI No. 4010;[4] *People v. Montiel* (1993) 5 Cal.4th 877, 919 (*Montiel*) ["hearsay problems [usually] will be cured by an instruction that matters admitted through an expert go only to the basis of his opinion and should not be considered for their truth"].)

"*Sanchez* announced a 'paradigm shift' regarding how out-of-court statements used as expert testimony basis are treated under California hearsay law." (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 588.) *Sanchez* departed from *Gardeley,* and rejected *Montiel*'s "two-pronged approach to balancing 'an expert's need to consider extrajudicial matters, and a jury's need for information sufficient to evaluate an expert opinion' so as not to 'conflict with an accused's interest in avoiding substantive use of unreliable hearsay.' [Citation.] . . . [U]nder this paradigm, there was no longer a need to carefully distinguish between an expert's testimony regarding background information and case-specific facts. The inquiry instead turned on whether the jury could properly follow the court's limiting instruction in light of the nature and amount of the out-of-court statements admitted. . . . [W]e conclude this paradigm is no longer tenable because an expert's testimony regarding the basis for an opinion *must* be considered for its truth by the jury." (*Sanchez, supra*, 63 Cal.4th at p.679.) "Once we recognize that the jury must consider expert basis testimony for its truth in order to evaluate the expert's opinion, hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth. If an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay. Like any other hearsay evidence, it must be properly admitted through an applicable hearsay

---

[4] See also CALCRIM No. 360.

exception.  Alternatively, the evidence can be admitted through an appropriate witness and the expert may assume its truth in a properly worded hypothetical question in the traditional manner." (*Id*. at p. 684, fn. omitted.)  "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.)

*Sanchez* addressed gang expert testimony in a criminal prosecution, thus also implicating constitutional confrontation rights. (*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) [admission of testimonial hearsay against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses].)  *Sanchez* is not, however, limited in its application to criminal proceedings. (*People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 10 [applying aspect of *Sanchez* concerning state evidentiary rules for expert testimony in civil nuisance action]; *People v. Burroughs* (2016) 6 Cal.App.5th 378, 383 (*Burroughs*) [sexually violent predator commitment].)  The *Sanchez* court stated its intention to "clarify the proper application of Evidence Code sections 801 and 802, relating to the scope of expert testimony" generally. (*Sanchez, supra*, 63 Cal.4th at p. 670; *Burroughs*, at p. 405, fn. 6.)  The court explained, "When *any* expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  It cannot logically be maintained that the statements are not being admitted for their truth." (*Sanchez,* at p. 686, italics added.)  The court specifically disapproved "prior decisions concluding that an expert's basis testimony is not offered for its truth, or that a limiting instruction, coupled with a trial court's evaluation of the potential prejudicial impact of the evidence under Evidence Code section 352, sufficiently addresses hearsay and confrontation concerns" and disapproved *Gardeley* "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez*, at p. 686, fn. 13.)

*Sanchez* reiterates that an expert "may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. . . . There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as

7

opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception." (*Sanchez, supra*, 63 Cal.4th at pp. 685–686.)

B.     *Application of* Sanchez

      1.     *Forfeiture*

We first reject the Conservator's assertion that K.W. forfeited any hearsay issue by failing to make a contemporaneous objection in the trial court.  As the Conservator concedes, failure to raise an issue at trial is generally excused where an objection would have been futile or wholly unsupported by existing substantive law.  (*People v. Welch* (1993) 5 Cal.4th 228, 237–238.)  *Gardeley* and *Montiel* were controlling Supreme Court authority at the time of K.W.'s trial and his trial counsel was not required to assert objections that would have been clearly, and correctly, overruled.

      2.     *Retroactivity*

The Conservator argues we should not apply *Sanchez* retroactively to LPS jury trials pending on appeal, based on justifiable reliance by litigants on the prior contrary rule.  (*People v. Guerra* (1984) 37 Cal.3d 385, 399.)  When a decision establishes a new rule, and there is " 'clear break with the past' . . . i.e., when the decision (1) explicitly overrules a precedent of this court [citation], or (2) disapproves a practice impliedly sanctioned by prior decisions of this court [citation], or (3) disapproves a longstanding and widespread practice expressly approved by a near-unanimous body of lower-court authorities [citation,] [¶] . . . courts may choose to make, on grounds of policy, an exception to 'the ordinary assumption of retrospective operation.' " (*Id.* at p. 401.)  In deciding whether to make such an exception, a court weighs three factors:  "(a) the purpose to be served by the new standards, (b) the extent of the reliance . . . on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." (*Ibid.*)[5]

---

[5] *Guerra*'s retroactivity test has been questioned with respect to new rules for the conduct of *criminal* prosecutions based on the federal Constitution.  (*People v. Hedgecock* (1990) 51 Cal.3d 395, 410, fn. 4.)

8

*Sanchez* unquestionably established a new rule of law, contrary to evidentiary rules and practice recognized and expressly authorized in *Gardeley* and *Montiel*.  In a civil proceeding such as this,[6] where constitutional confrontation principles are not at issue and litigants and the courts have justifiably relied on prior contrary authority, a reasoned policy argument can be made that the *Sanchez* rule should not be made retroactive.  However, as K.W. notes, although LPS proceedings are not criminal matters, "[t]he liberty interests at stake in a conservatorship proceeding are significant." (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 540.)  Not only may "[a] person found to be gravely disabled . . . be involuntarily confined for up to one year," but, "[i]n addition to physical restraint, '[t]he gravely disabled person for whom a conservatorship has been established faces the loss of many other liberties . . . .' " (*Ibid.*)

We have found no case that has yet directly addressed this issue,[7] and because of the relatively short duration of LPS commitments, the question may now be largely moot. Significantly, our Supreme Court granted review in the majority, if not all, of the decided cases presenting *Gardeley* issues on appeal while *Sanchez* was being considered, and subsequently remanded those cases to the Court of Appeal with instructions to reconsider prior opinions in light of *Sanchez.*  (See, e.g., *People v. Vega-Robles* (2017) 9 Cal.App.5th 382, 387 [gang testimony]; *People v. Ochoa, supra,* 7 Cal.App.5th at

---

[6] Proceedings under the LPS Act are civil in nature.  (*Conservatorship of John L., supra,* 48 Cal.4th at p. 147.)  The constitutional rule announced in *Sanchez* does not extend to civil cases.  (See *Sanchez, supra*, 63 Cal.4th at p. 680, fn. 6 ["[b]ecause *Crawford* is based on the Sixth Amendment right to confrontation, its rule has not been extended to civil proceedings . . . "]; *People ex rel. Reisig v. Acuna, supra,* 9 Cal.App.5th at p. 34; see also *Burroughs, supra,* 6 Cal.App.5th at p. 405, fn.6 [state and federal confrontation clauses not applicable in sexually violent predator proceedings].)

[7] *Burroughs* applied *Sanchez* retroactively in reversing a sexually violent predator commitment under section 6600 et. seq.  The issue of retroactive application was neither discussed nor expressly decided.  (*Burroughs, supra,* 6 Cal.App.5th at p. 412.)  Another division of this court recently applied *Sanchez* retroactively in reversing denial of a petition by a criminal defendant found not guilty by reason of insanity for transfer to a conditional release program under Penal Code section 1026.2, subdivision (a).  (*People v. Jeffrey G.* (July 13, 2017, A149067) ___ Cal.App.4th ___ [2017 Cal.App.Lexis 619].)  The *Jeffrey G.* court applied rules of criminal retroactivity.

pp. 578, 580 [gang testimony].)  Although these cases appear to have presented *Crawford* confrontation issues as well, absent a different policy articulation by the Supreme Court, we will assume *Sanchez* is fully retroactive in any context where liberty interests are at stake.[8]

3.      *Bravo's Testimony*

We would agree that at least some portions of Bravo's testimony are problematic in light of *Sanchez*.  Specifically, elements of his testimony were drawn from review of medical and institutional records and discussions with others, as opposed to personal contacts with K.W.  For example, Bravo characterized K.W. as "very inappropriate with his boundaries with people both in a sexual manner"—touching and groping women— and generally being "provocative," based on incidents described in prior hospitalization records.  Bravo told the jury that K.W. had to leave a local psychiatric facility during the preceding year due to altercations with others, and that K.W. had been evicted from outside housing for causing a fire by leaving cooking items on a hot stove.  Bravo also testified that K.W. had been involved in physical altercations involving throwing things and insulting people.  He described K.W.'s failure to observe rules and participate in his treatment program while in a community setting, and his failure to obtain appropriate health care and treatment.  Bravo testified that "records show and [K.W.'s] case manager says that he has not had impulse control around money."  All of this was case-specific hearsay, and inadmissible under *Sanchez* absent independent proof, or establishment by a hearsay exception.

The Conservator suggests any case-specific hearsay related by Bravo came from medical records qualifying for admission under the business records exception to the hearsay rule (Evid. Code, § 1271).  While perhaps true, no attempt was made at trial to establish a proper business records foundation for any of the documents reviewed or relied upon by Bravo, and none were offered or admitted in evidence.  *Sanchez* does not

---

[8] Different policy considerations would be presented in general civil litigation that might dictate a different result.  That issue is not before us, and we express no opinion on it.

10

permit an expert to "relate as true case-specific facts asserted in hearsay statements, *unless they are independently proven by competent evidence or are covered by a hearsay exception.*" (*Sanchez, supra,* 63 Cal.4th at p. 686, italics added.) Admission of this evidence was therefore error.

Not all of the testimony K.W. complains of, however, was inadmissible under the *Sanchez* standard. K.W. suggests it was *Sanchez* error when Bravo testified that, in formulating his opinion, he received "[a] lot of the information about [K.W.'s] past and his functioning in other settings" provided by "other people." *Sanchez* does not change the rule of Evidence Code section 801, subdivision (b), that an expert may still rely on hearsay in forming an opinion, and may tell the jury in general terms that he did so. (*Sanchez, supra*, 63 Cal.4th at pp. 685–686; *People v. Stamps* (2016) 3 Cal.App.5th 988, 996.) "Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests." (*Sanchez*, at pp. 685–686.)

4. *Prejudice*

"We review the erroneous admission of expert testimony under the state standard of prejudice." (*People v. Stamps, supra,* 3 Cal.App.5th at p. 997.) The standard for prejudice applicable to state law error in admitting hearsay evidence is whether it is reasonably probable the appellant would have obtained a more favorable result absent the error.[9] (*People ex rel. Reisig v. Acuna, supra*, 9 Cal.App.5th at p. 36; *Burroughs, supra,* 6 Cal.App.5th at pp. 411–412.) We conclude the error here was harmless.

Bravo's testimony was not based entirely on third party reports, but also upon his own experience: serving as a consulting member of K.W.'s treatment team; consulting about appropriate placements and services for K.W.; and conducting three personal interviews and evaluations of K.W. Bravo also had observed K.W. when K.W. was a patient at Sonoma County's psychiatric emergency facilities. As Bravo testified, he was "pretty familiar" with K.W. In addition, Bravo properly testified to the fact he

---

[9] *People v. Watson* (1956) 46 Cal.2d 818, 836.

11

considered medical and institutional reports documenting K.W.'s behavioral history, and he testified unequivocally to his diagnosis—opining that K.W. suffered from a schizoaffective disorder, with "main symptoms" of "disorganized thinking and behaviors" resulting in lack of impulse control, impaired judgment, and "paranoid and grandiose" delusions. Bravo further properly opined that K.W.'s lack of insight into his mental illness and the impact of that illness on his behaviors affected his ability to provide for himself. He testified, without any contradictory medical opinion, that K.W met the criteria for grave disability criteria established in the LPS Act and was unable to care for himself.

The only evidence to the contrary was K.W.'s own testimony. K.W. acknowledged his mental illness but insisted he was capable of providing for his own needs in the community. K.W was examined about several of the hearsay incidents described by Bravo, and he attempted to explain or deny the alleged conduct. Therefore, much of the disputed evidence was otherwise before the jury and it had full opportunity to assess K.W.'s demeanor, and to make its own assessment of the credibility of K.W.'s explanations and denials.

K.W. speculates that evidence of specific instances of his behavior improperly bolstered Bravo's opinion before the jury. The fact remains, however, that the only medical evidence before the jury was an unimpeached opinion of K.W.'s disability and incapacity from a well-qualified expert, and K.W.'s contrary view of his own abilities could reasonably have been rejected by the jury. We do not find it reasonably probable the jury would have reached a different result in the absence of the improperly admitted testimony.

### III. DISPOSITION

The judgment is affirmed.

12

_____
BRUINIERS, J.

WE CONCUR:


_____
JONES, P. J.


_____
SIMONS, J.

A148614

Superior Court of Sonoma County, No. SPR-87836, René Auguste Chouteau, Judge.

Jeremy T. Price, under appointment by the Court of Appeal, for Objector and Appellant.

Bruce D. Goldstein, County Counsel, Phyllis C. Gallagher, Michael King, Deputy County Counsel, and Katherine P. McGrath for Petitioner and Respondent.