Filed 8/16/24  P.v. Lopez CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ERWIN ANTONIO LOPEZ,<br><br>        Defendant and Appellant. | A169212<br><br>(Solano County Super. Ct. No. FC40940) |

Erwin Antonio Lopez appeals from the trial court's order extending his commitment to a state mental hospital pursuant to Penal Code section 1026.5, subdivision (b), which governs the procedures for extending the commitment of individuals found not guilty by reason of insanity.[1]  Lopez's court-appointed attorney filed a brief identifying no specific issues as grounds for relief, asserting that our independent review of the record is required under *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).  In the alternative, his attorney requests that we exercise our discretion to conduct an independent review of the record under *Conservatorship of Ben C.* (2007) 40 Cal.4th 529 (*Ben C.*).  Having now independently reviewed the record, we affirm.

---

[1] Undesignated statutory references are to the Penal Code.

1

## BACKGROUND

### A.

Section 1026.5, subdivision (b), sets forth the procedural and substantive requirements for extending the commitment of a person who, like Lopez, has been committed after having been found not guilty of a felony by reason of insanity. (*See People v. Kendrid* (2012) 205 Cal.App.4th 1360, 1366 (*Kendrid*).) To justify continued commitment in a treatment facility, the People must prove, beyond a reasonable doubt, that the person "represents a substantial danger of physical harm to others" because of "a mental disease, defect, or disorder." (§ 1026.5, subd. (b)(1); *Kendrid, supra,* at pp. 1366, 1370.) As part of that showing, the People must establish that the committed person " 'has serious difficulty in controlling dangerous behavior.' " (*Kendrid, supra,* at p. 1366; *see also People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1164-1165 (*Zapisek*).) A single psychiatric opinion that the person is dangerous due to a mental disorder can constitute substantial evidence in support of an extended commitment. (*Zapisek, supra,* at p. 1165.) Whether a person presents a substantial danger of harm to others is a fact question. (*Kendrid, supra,* at p. 1370.)

The committed person may establish a defense to re-commitment by showing, by a preponderance of the evidence, that he no longer presents a substantial danger of physical harm to others because he is now taking medication that controls his condition, and he will continue to take that medication if released. (*See People v. Bolden* (1990) 217 Cal.App.3d 1591, 1600-1602.)

Although the proceedings are civil (*see People v. Martinez* (2016) 246 Cal.App.4th 1226, 1238 (*Martinez*)), committed persons in section 1026.5, subdivision (b) proceedings are "entitled to the rights guaranteed under the federal and State Constitutions for criminal proceedings." (§ 1026.5, subd. (b)(7).)

2

Among the procedural rights specified by statute are the right of the committed person to a jury trial and to be represented by counsel. (§ 1026.5, subds. (b)(3)-(4), (b)(7).) Section 1026.5 also sets forth the deadlines applicable to a petition for extended commitment. (*See* § 1026.5, subds. (b)(1)-(2), (b)(4).)

If the jury (or court, if jury trial is waived) finds that the committed person poses a substantial danger of physical harm to others due to a mental disorder, the court must order the person recommitted for a period of two years. (§ 1026.5, subd. (b)(8).)

**B.**

Lopez was originally committed to a state mental hospital in 1996 after being found not guilty by reason of insanity of two counts of battery on a corrections officer and one count of possession of a deadly weapon by a prisoner. At the time of the extension proceedings, Lopez was an in-patient receiving treatment at Patton State Hospital, a locked psychiatric facility. His most recent commitment was due to expire on December 23, 2023.

Based on the People's May 11, 2023, petition to extend Lopez's commitment, the court held a jury trial beginning in October 2023, during which Lopez was represented by counsel. Because Lopez had a medical condition requiring him to attend dialysis three days a week, he elected to attend the trial remotely, via video. The parties also agreed the witnesses would testify remotely.

At the conclusion of the trial, the jury found true "the allegation that . . . Lopez is a person who currently poses a substantial danger of physical harm to others as a result of a mental disease, defect or disorder, and that is not controlled through medication, within the meaning of . . . section 1026.5[, subdivision] (b)." The trial court thereafter entered an order

3

extending Lopez's commitment by a period of two years, to December 23, 2025.

C.

At the trial, based on the parties' stipulation, the court informed the jury that in 1996, Lopez had been convicted of three felony offenses committed while he was incarcerated: two counts of battery and one count of weapon possession. In addition, the court informed the jury that Lopez had been found not guilty of those felony crimes by reason of insanity, and was committed to a state mental hospital as a result.

The People presented five witnesses, each of whom Lopez's trial counsel cross-examined. The witnesses included three staff members from Patton State Hospital who had experience treating or working with Lopez: a staff psychiatrist (Dr. Ashrah Helmy), a forensic evaluator and unit psychologist (Dr. Brittany Dey), and a licensed clinical social worker (Kim Braxton). Another witness (Dr. Ryan Jordan) was a senior psychologist specialist at Patton and the final witness (Dr. Kelly Hunsicker) was a forensic psychologist at Patton. The parties stipulated that Dr. Helmy was an expert in psychiatry, Dr. Dey and Dr. Jordan were experts in psychology, and Dr. Hunsicker was an expert in forensic psychology.

Lopez conceded at trial that he has a mental illness. Consistent with that concession, the trial testimony established that Lopez had been diagnosed with schizoaffective disorder, bipolar-type, a "chronic" or "severe and persistent mental disorder [¶] . . . [¶] . . . that lasts a lifetime." In addition, Lopez had been diagnosed with moderate alcohol use disorder.

Symptoms of schizoaffective disorder, bipolar-type, include major depression or manic episodes, accompanied by "a period of significant presence of psychotic symptoms." The psychotic symptoms may include paranoia, delusions, or hallucinations,

4

which involve "responding to stimuli that are not present in reality," as well as disorganized thinking or behavior. The illness also involves elevated (manic) or irritable moods, with periods of mania being accompanied by grandiosity or "having an inflated . . . sense of self, distractibility, talkativeness, racing thoughts, increase in speech, pressured speech, increase in goal-directed activities," impulsivity, and "taking risks that [the individual] wouldn't normally take."

At Patton, Lopez was compliant with his prescribed medication regime, which required taking two psychotropic medications to help manage his symptoms. Although Lopez continued to experience residual symptoms of his mental illness while on medication within the structured hospital setting, "his symptoms [we]re not so severe and exacerbated that he [wa]s in danger and requiring one-to-one observation, five-point restraints or frequent [intramuscular] medications." If Lopez were to stop taking his medication, however, he "would be at a higher likelihood of having an acute exacerbation of the schizoaffective disorder, bipolar-type illness," meaning "[h]e would be at an increased risk for having" an uncontrolled psychotic episode.

As a result of Lopez's treatment, including medications, the symptoms of his mental illness were in partial remission and his behavior had been stable. Braxton testified that she tended to get along with Lopez, whom she described as a "cool person" who likes to joke around a lot. She had never observed Lopez assault or verbally abuse anyone on his psychiatric unit. Dr. Helmy similarly testified that he had never seen Lopez being physically violent or abusive to anyone.

Lopez had been involved in two incidents of conflict with other patients, one involving pushing and one in which the other patient assaulted Lopez and broke his glasses; Lopez reported to Dr. Helmy that he did not bear a grudge against those patients and had no plans to retaliate against them. Dr. Jordan recounted

5

that according to Lopez, there was one incident in August 2023 in which Lopez had been "horse playing on the unit" and "wrapped his arm around a staff member's neck in a playful manner." Lopez recognized that his behavior was concerning to the staff, who had been preparing to give him an intramuscular shot of medication to bring his symptoms under control; because Dr. Jordan arrived to take Lopez off the unit for a meeting, however, staff did not administer the injection.

Lopez continued to exhibit a variety of symptoms of his mental illness while residing in the controlled environment at Patton. Dr. Dey, who was Lopez's treating psychologist for two and one-half years before becoming a forensic evaluator, testified that despite his medication, she still observed in Lopez instances of delusional thinking, grandiosity, elevated mood, irritability, thought disorganization and problems with impulsivity. Based on her interview with him, Dr. Hunsicker observed that Lopez displayed ongoing psychosis, including paranoia, impulsivity, thought disorder, and hypomania, and he suffered from grandiose delusions.

Lopez continued to grapple with a "lack of orientation to reality." For example, one of Lopez's grandiose delusions involved his plan to make a movie about Patton after he is released: he stated that the movie "will be great. People say 700 million. And, they are making commercials and coming out with movies that are made off of me." Lopez also discussed having played for the Dodgers in the World Series and commented that Dr. Jordan was "Donald Trump's right-hand man."

In addition, Lopez continued to have paranoid delusions. Dr. Helmy testified that Lopez had an "on-and-off" delusion that the state was punishing him by making him do dialysis. Lopez shared with Dr. Hunsicker his paranoid delusion that a Cambodian gang was targeting him and that as a result, he

needed a bullet-proof vest to attend his medical appointments, otherwise, he said, " 'I am going to get shot.' "

Dr. Dey and Dr. Hunsicker also testified that Lopez exhibited ongoing persecutory or paranoid delusions about the victims of his 1996 battery offenses. According to Dr. Dey, Lopez "believ[ed] the victims of his offense" (two correctional officers) "were . . . out to sabotage him" and he believed that the victims "had threatened to 'cut his balls off.' " Lopez reportedly told Dr. Hunsicker that the victims of his offenses "were out to get him and that he actually did not do anything wrong."

Dr. Hunsicker opined that at the time of his 1996 offenses, Lopez's "decision making was compromised as a result of his mental illness." Lopez acknowledged to Dr. Hunsicker that at the time of the offenses, he was noncompliant with his psychiatric medications and was experiencing racing thoughts. But Lopez also denied hitting anyone, insisted that the victims were "out to get [him]," failed to express any remorse, and had no "plans for how he could prevent such an act from happening again in the future." Dr. Hunsicker concluded that Lopez had "very minimal to zero insight into understanding how his mental health disorder influenced him at the time" of his offenses. Dr. Helmy similarly testified that Lopez minimized his 1996 offenses and was unable to understand the connection between his mental illness and his behavior that led to the crime. And Dr. Dey reported that Lopez "never expressed any understanding of how his mental health symptoms impacted his behavior in the context of his controlling offense."

More generally, several witnesses testified that Lopez had limited insight into the connection between his mental illness and his behavior, and they observed that he was unable or unwilling to identify or discuss his triggers or warning signs preceding a psychotic episode. Dr. Dey stated that Lopez did not report any understanding of his psychosis-related symptoms,

7

"which concerned [her] given the fact that that so heavily has impacted past evidence of violence with him." When Dr. Hunsicker asked Lopez to describe his symptoms, Lopez stated: " 'I am coming to reality. This is one of my psychosis, too, is my triggers, too, religious psychosis. I thought it was raining in my cell and my cell caught on fire. I had the Bibles.' " When Dr. Helmy asked Lopez how he would cope with a psychotic episode if he is released into the community, he had no response.

With respect to Lopez's plans should he be released from the hospital, he was unwilling to commit to continuing his medications. He "did not feel that . . . stopping medications would be problematic." When Dr. Hunsicker asked if he would continue to take his medications, Lopez stated: " 'Well, maybe not forever. I mean, do I really need them?' " Lopez similarly asked Dr. Helmy whether "the medicines are . . . necessary." Dr. Helmy described Lopez as "ambivalent" about whether he would continue to take his medication if released.

Lopez voiced his desire to go to Hollywood and make a movie if released, or to "go back to [his] gang life." He reportedly had no other plans for how he would support himself, nor did he communicate plans as to where he would live or where he would get treatment. Although committed individuals at Patton have the option of developing a "Wellness and Recovery Action Plan" with respect to their mental illness—a plan to ensure they do not relapse if released into the community—Lopez did not have such a plan. He had previously developed one that was years old, but he never updated it and reported that he had thrown it away. In addition, although substance abuse would exacerbate the symptoms of his mental illness, Lopez had no relapse prevention plan to address his alcohol use disorder and was not committed to maintaining his sobriety.

Dr. Hunsicker opined that Lopez's plans were "highly problematic and completely neglect[ed] his severe mental health

8

disorder, his risk for future violence, and his risk for psychiatric decompensation." In her opinion, "Lopez d[id] not have the ability to understand . . . the symptoms of his illness in the moment to know when they are worsening and to know when he needs to seek help." Lopez's lack of insight was concerning because the ability to recognize his symptoms and ask for help in the moment "is a critical component to community safety." Based on her evaluation of Lopez and the testimony of all the other witnesses, Dr. Hunsicker opined that "if [Lopez] were to be released to the community[,] . . . he does represent a substantial danger of harm to others by reason of his severe mental illness." She added that Lopez would have "a serious difficulty controlling [his] dangerous behavior" if he were in the community.

## DISCUSSION

Lopez's appellate counsel advised him of his right to file a supplemental brief within 30 days of the date of filing the opening brief, but Lopez has not submitted any such brief. Lopez's counsel contends that independent review of the record in this case is required under *Wende*. Counsel's brief does not address cases from other districts holding that, consistent with *Ben C.*, independent appellate review is not required when a committed person's attorney identifies no arguable issues in an appeal from an order extending commitment under section 1026.5, subdivision (b). (*See People v. Luper* (2022) 73 Cal.App.5th 1077, 1080-1083; *Martinez, supra,* 246 Cal.App.4th at pp. 1230, 1231-1240.) We need not decide in this case whether independent review is mandatory or discretionary in section 1026.5, subdivision (b), appeals however, because we have chosen to conduct such a review regardless. Based on our review, we conclude there are no arguable errors that would result in a disposition more favorable to Lopez.

9

## DISPOSITION

The trial court's order extending Lopez's commitment to Patton State Hospital to December 23, 2025, is affirmed.

BURNS, J.

WE CONCUR:

SIMONS, ACTING P.J.
CHOU, J.

*People v. Lopez (A169212)*

10