Filed 12/12/24  Conservatorship of the Person of C.D. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of C.D. | |
| PUBLIC GUARDIAN OF SAN MATEO COUNTY, as Conservator, <br><br> Petitioner and Respondent, <br><br> v. <br><br> C.D., <br><br> Objector and Appellant. | A170335 <br><br> (San Mateo County Super. Ct. No. 20PR000592D) |

C.D. appeals from the denial of his request for rehearing of orders granting a petition for conservatorship and appointing the San Mateo Public Guardian (Public Guardian) as conservator.  His appointed appellate counsel filed a brief setting forth the applicable facts and law pursuant to *Conservatorship of Ben C.* (2007) 40 Cal.4th 529 (*Ben C.*).  Counsel informed C.D. that he could file a supplemental brief, but C.D. has not done so.[1]  Our discretionary review of the record discloses no arguable issues, and we therefore affirm.

---

[1] Counsel's declaration states that he has communicated with C.D. at his current address; explained his evaluation of the record; informed C.D. of his right to file a supplemental brief and that if he does not, the appeal would

1

# BACKGROUND

On October 24, 2023, the Public Guardian filed an ex parte petition to appoint a temporary conservatorship under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5350 et seq.)  The Public Guardian was appointed temporary conservator the same day.

A petition to establish conservatorship filed on November 2, 2023, alleged that C.D. was gravely disabled as a result of a mental disorder and unable to provide for his own basic needs, food, clothing or shelter, and was unwilling or incapable of accepting treatment voluntarily.  A hearing was held on November 21, 2023, and the court appointed the Public Guardian conservator of the person and estate.  On March 29, 2024, C.D. requested rehearing.

At a hearing on April 17, 2024, clinical psychologist Alicia Robinson opined that C.D. was unable to provide for his own food, clothing and shelter as a result of his mental illness, was still gravely disabled and should remain conserved.  Robinson had interviewed C.D. not long before the hearing and had previously interviewed him in May 2023 for a conservatorship hearing that resulted in the termination of a previous conservatorship.[2]  She had also reviewed records from C.D.'s current facility and from a hospitalization following termination of the prior conservatorship.

likely be dismissed; sent C.D. the transcripts of the record on appeal and a copy of counsel's brief; and advised C.D. that he could request to relieve counsel.  This court sent notice to C.D. on November 5, 2024, at the same address provided by counsel, but the mailing was returned with notations indicating the recipient was not at this address and the mail could not be forwarded.

[2]  The previous conservatorship had been established in 2020 and reestablished in 2021 and 2022, then terminated on June 7, 2023.

Asked how C.D. came back under conservatorship in November 2023, Robinson testified that when the prior conservatorship ended, C.D. voluntarily continued to live at Synergy, the licensed care facility where he had previously been living in an apartment supported by the facility.[3] After about two months, he stopped taking his medication and became symptomatic. C.D. told Robinson that he had a fight with someone and was kicked out of Synergy, but Synergy's records reflected that as staff was taking C.D. to the hospital, he "A-walled out of the vehicle" and could not be found. The November 15, 2023 Conservatorship Investigation Report indicates that C.D. was hospitalized in September 2023, released in early October 2023, then hospitalized again in October.

Robinson testified that C.D.'s stopping his medication had been a pattern in the past and was one of her concerns in finding he was gravely disabled.[4] She believed C.D. suffered from schizoaffective disorder. His current symptoms included mood fluctuations, agitation, irritability, disorganized thinking and impaired insight and judgment. He had struggled with psychotic symptoms previously that were not currently causing him problems, and although impulsive behaviors had been documented over the past several months, Robinson did not experience these during her interview. She testified that "it seems like he's been struggling" to participate in the program and find stability at his present facility.

---

[3] Although the facility is referred to as "Synergy" in the reporter's transcript, the Conservatorship Investigation Report provides the name "Psynergy Nueva Vista."

[4] Similarly, the investigation report for the November 2023 hearing stated that when C.D. was not in a structured program, he "typically [did] not remain adherent to mental health care or psychotropic medication" and would "resume using illicit substances and quickly decompensate."

C.D. had previously been taking diabetes and thyroid medication but was not currently taking either, and he told Robinson he might have bipolar disorder but did not like labels and did not feel they were helpful in treatment. He was worried that he had lymphoma but had not been diagnosed with it; he said the facility was refusing to evaluate him for lymphoma or give him access to treatment from a primary care doctor.

C.D. had been placed at a locked psychiatric treatment facility since January 2024. His treatment involved medication changes, as he had a "complicated list of medications" when he came from the hospital to the present facility. His medication had last been changed in March. Robinson thought he might still be adjusting and, with further treatment, might be able to move to a lower level of care as he had at Synergy, where he could go out independently into the community.

When Robinson met with C.D. in May 2023, he had been calmer and had seemed more centered and had been able to have more insightful conversations about his symptoms and struggles than when they met recently, just before the current hearing. At the recent meeting, C.D. was "pretty agitated" and "almost untethered," his speech was pressured and he was "pretty irritable," although he kept his composure.

Based on C.D.'s history and current struggles with mood and possibly substance abuse, Robinson did not believe he would manage his medications successfully on his own. When she asked about his plans if the conservatorship was terminated, he first said he was investigating some things on Craigslist; when asked a second time, he said he would move into hotel room, then live in a van he would purchase with CalABLE funds he

4

believed he would have access to once off conservatorship.[5]  He said his last period of time in the community failed because he was kicked out of Synergy and did not have enough time to learn how to access his funds, but to Robinson this did not "line up" because C.D. had had two months to make plans and figure out his resources while he was living at Synergy.  Robinson testified that it seemed C.D. had stopped his medication; when she asked about this, he said he was not required to take medicine when he was off conservatorship.

C.D. testified that he wanted to leave his present facility and, if he did, he would provide for himself with "the money that I have with a plan that I have."  He testified that he would take the lithium that was prescribed for him and that he had verified that he had a two-week supply and had set up an appointment with the psychiatrist in the area through his Medi-Cal insurance.  His mother had agreed to put him up in the San Francisco Travel Lodge for a couple of days while he obtained his CalABLE funds, $27,115.96 inherited from an uncle.  He would then buy "probably a van," which he would live out of because he did not like having to deal with roommates.

---

[5] Robinson's understanding was that C.D. had a CalABLE account that his family started for him with inheritance money from a relative.  Asked on cross examination whether it would change her opinion as to whether C.D. was gravely disabled if the check available to him was $25,000, she testified that it would not.  Robinson felt C.D. was "quite vulnerable" and access to the funds would not only *not* make him more stable but might lead to a greater risk of "a larger decompensation of a greater magnitude."  Robinson explained, "When he left Synergy and A-walled in the community[,] within days he had lost his laptop and had sent an email to his family that he was selling his body for drug money."  Knowing C.D.'s history of struggling with substance abuse, Robinson was concerned that the money would be "manipulated from his possession by people who may have influence over him when he doesn't really have . . . the judgment to weigh these things in a safe manner."

From searching the internet, C.D. expected to be able to find a van with decent mileage, around 160,000 miles, for about $8,000 to $10,000. He would not go to restaurants and would buy food "frugally" and probably cook it on a portable stove. He had adequate clothing and could easily go to Good Will to buy "fashionable cheap clothing." C.D. testified that he intended to go to school, probably to become a computer science major and get a degree in machine learning engineering, which would be very lucrative. He testified that he was sufficiently smart, capable and committed, but that in any case he did not need to do this because he could already support himself.

C.D. acknowledged that he was charged with two felonies after getting off the prior conservatorship in June 2023. When asked what went wrong, he provided his perspective on the events Robinson had described. C.D. testified that when the conservatorship ended, he went back to Synergy while trying to get control of the money that would have allowed him to buy a van or get an apartment,[6] and he got into a fight. Synergy could not detain him automatically because he was not conserved, so he waited for his money to arrive, but it "didn't arrive in time." C.D. explained, "They tried to take me to the hospital, and so I was either going to leave without my money or go back into the system and do this all over again. And, so, of course, I chose to be homeless." After four months on the street, he asked his family for help and they refused, telling him to "go back into the system and they'll provide you a bed," so he did. Of being conserved again, C.D. stated, "[t]hey get paid to make sure that people end up in these places and take pills." C.D. denied being mentally ill or disabled and testified that he had never hallucinated.

---

[6] C.D. disputed Robinson's testimony that he stayed at Synergy for two months after termination of the conservatorship and that he lived in an apartment Synergy "appointed" to him, saying this information was fabricated.

On cross examination, C.D. acknowledged that he stopped taking his medication when he left Synergy because the psychiatrist there had refused his request to slowly take him off drugs he did not feel were suitable for him. He was not participating in programming because "it's a daycare and those groups don't help anyone and I didn't choose to be in this situation in the first place." He testified that, on principle, he was not going to participate "in a system that I don't believe in for reasons that are trumped up against me." He testified that his felony charges were not relevant to the conservatorship case because it was based on grave disability rather than danger to self or others. He explained that after being homeless for about three months, eating out of trash cans, "the adventure was getting old," so he "hit someone in the face . . . because [he] wanted to be arrested and brought in so that [he] could get some sleep."

C.D. asked to speak to the judge and made a lengthy statement protesting what he viewed as an attempt to reestablish conservatorship "because of a perceived likelihood of future relapse" when in fact he was healthy, had means and was able to clothe and feed himself, and did not belong in the places where he had been forced to live with people who are gravely disabled. He asked the court to let him "get on with my life."

As the court began to discuss the testimony, C.D. interjected explanations, protested the "nonsense" he was being subjected to and said he was not going to listen to the judge "waste the rest of [his] breath explaining to [him] why it's okay to do that." When given the choice to stay and listen or be taken out of the courtroom, C.D. asked if the court was going to "let [him] free" and said he did not want to stay if the court was "just going to explain" to him. After C.D. was taken out of the courtroom, the court noted Dr. Robinson's testimony that C.D. continued to struggle with stability, referred

7

to C.D.'s many "outbursts" during the proceeding and, "more importantly," observed that C.D. did not appear to have an "established plan." The court concluded that C.D. was still gravely disabled and did not meet the preponderance of the evidence standard for changing the conservatorship decision.

C.D. filed a timely notice of appeal.

## DISCUSSION

In *Ben C.*, our Supreme Court held that "[i]f appointed counsel in a conservatorship appeal finds no arguable issues, counsel . . . should (1) inform the court he or she has found no arguable issues to be pursued on appeal; and (2) file a brief setting out the applicable facts and the law." (*Ben C., supra*, 40 Cal.4th at p. 544.) In addition, "[t]he conservatee is to be provided a copy of the brief and informed of the right to file a supplemental brief." (*Id.* at p. 544, fn. 6.) The reviewing court may then dismiss the appeal if there are no arguable issues. (*Id.* at p. 544.)

C.D.'s appointed appellate counsel followed *Ben C.* Counsel reviewed the record, found no arguable issues and so informed C.D. at his then-current address; filed his brief in this court and provided C.D. with a copy; and informed C.D. that he could file a supplemental brief. Counsel recognizes that we are not required to independently review the record but asks us to exercise our discretion to do so. (*Ben C., supra,* 40 Cal.4th at p. 544, fn. 7 [appellate court may choose to retain an appeal rather than dismiss it].)

We have reviewed the record. Substantial evidence supports the court's finding that C.D. did not show by a preponderance of the evidence that he was no longer gravely disabled. (*Ben C., supra,* 40 Cal.4th at p. 541 [preponderance of the evidence standard].) C.D. was represented by able counsel.

## DISPOSITION

The order denying C.D.'s request for rehearing is affirmed.

_____

STEWART, P.J.

We concur.

_____

MILLER, J.

_____

DESAUTELS, J.

_Conservatorship of C.D._ (A170335)