Filed 3/24/26  Conservatorship of Z.A. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Conservatorship of the Person of Z.A.<br><br>CONTRA COSTA COUNTY PUBLIC GUARDIAN,<br><br>      Petitioner and Respondent,<br><br>v.<br><br>Z.A.,<br><br>      Objector and Appellant. | A173819<br><br>(Contra Costa County<br> Super. Ct. No. MSP21-00548) |

Z.A. appeals from the order granting a petition to reestablish conservatorship and appointing Contra Costa County Public Guardian (Public Guardian) as conservator.  Z.A.'s appointed appellate counsel filed a brief setting forth the applicable facts and law pursuant to *Conservatorship of Ben C.* (2007) 40 Cal.4th 529 (*Ben C.*). Counsel informed Z.A. that he could file a supplemental brief, but Z.A. has not done so.  Our discretionary review of the record discloses no arguable issues, and we therefore affirm.

## BACKGROUND

On April 10, 2025, the Public Guardian filed a petition to extend Z.A.'s conservatorship under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5350 et seq.)  The petition alleged that Z.A., whose current

1

conservatorship was due to terminate on June 14, 2025, continued to be gravely disabled as a result of a mental disorder and unable to provide for his basic personal needs for food, clothing or shelter. A court trial began on May 27, 2025.[1]

Dr. Shahbaz Khan testified as an expert in psychiatry and evaluation of grave disability. Dr. Kahn met with Z.A. at Napa State Hospital for 30-40 minutes on May 18, 2025, and reviewed "extensive records" including notes from current and prior deputy conservators and notes from present and past hospitalizations. He diagnosed Z.A. with chronic schizophrenia, which he described as a severe mental illness characterized by severe disorganization of thoughts resulting from delusions and hallucinations, as well as "negative symptoms" such as "loss of motivation, volition [and] mood," and catatonia, which includes "various kinds of immobility" or sometimes "being extraordinarily agitated, aggressive without any reason."[2] Hallucinations and delusions, both impairments in reality perception, are distinct from disorganization of thoughts, which refers to a group of symptoms affecting

---

[1] The petition was consolidated for trial with a previous petition filed on April 24, 2024. Z.A. had accepted conservatorship for specified periods under the April 2024 petition but a portion of the term addressed by the April 2024 petition remained unresolved when the April 2025 petition was filed.

[2] The history Z.A. related to Dr. Khan confirmed the diagnosis of severe mental illness and its chronicity. Z.A. said he had a nervous breakdown around age 19 and had since had numerous hospitalizations and treatment for psychotic-type symptoms. This history was consistent with the "typical timeline" of a severe psychotic break in the late teens or early 20s, and the persistence of symptoms at age 37, despite numerous hospitalizations, was consistent with the course of a severe schizophrenic disorder.

the way a person "thinks, feels, plans, and operates on a day-to-day basis" and is important in determining a person's functionality.

Schizophrenia is treated with medication, psychotherapy and psychosocial support/case management to assist the patient in becoming more independent in the community. Z.A.'s regular medications include neuroleptics (antipsychotics), mood stabilizers and an antidepressant. One of the neuroleptics, clozapine, requires scheduled monitoring of the patient's white blood cell count: For the first six months, the patient is given a one-week supply at a time, dependent on weekly blood testing; for the next six months, the medication is dispensed, and lab work done, every two weeks; then dispensing and lab work is monthly. If the patient misses more than two days of medication, the process must be started over from the beginning, including lowering the dosage and slowly titrating it back up to the desired dose. One of the other neuroleptics is an injectable taken once a month that must be given by a trained medical professional. In addition to scheduled medications, Z.A. takes several medications "as needed" for "breakthrough" symptoms.

When interviewed, Z.A. was "for the most part" polite and he was cooperative "in terms of being present" and willing to listen to Dr. Khan's questions, but he was "not cooperative enough in terms of going into details about his symptoms or descriptions." His disorganization was "relatively mild." His grooming and hygiene were "subpar," "below average," "[m]ildly unkempt."

Z.A. told Dr. Khan that he was diagnosed with bipolar disorder, schizoaffective disorder, schizophrenia and auditory hallucinations, and reported that he heard voices and experienced a sense of persecution or "paranoid-type ideas" as a result. He said the voices "put him down,"

3

demeaned him and made threats, but when Dr. Khan asked him to elaborate, Z.A. became guarded and refused further discussion, which Dr. Khan testified was consistent with paranoia. Z.A. also described symptoms including depression and intense mood swings.

Dr. Khan testified that paranoia can affect a person's ability to satisfy day-to-day needs for food, clothing and shelter in the community because the necessary interaction and engagement with other people cannot be accomplished by someone who expects harm from others and feels threatened and agitated. Aggression and violence are common behaviors in schizophrenia, especially when paranoia is a component. Paranoia makes the patient feel a need to protect against attacks from perceived enemies, which causes the patient to react with anger and often violence. Over time, the barrage of delusional oppressive, threatening experiences leads to rages and violence against people who may not have "caused any direct triggers," and it is common for people the patient interacts with to become objects of the paranoia and aggression. A pattern of aggression is relevant in evaluating grave disability because a person with unpredictable aggressive behavior cannot negotiate "complex privileges" like housing.

Z.A.'s hospital records reflect repeated assaults on staff and peers, often associated with Z.A.'s reporting he was hearing voices telling him to hit someone. In response to hypotheticals based on the hospital records, Dr. Khan testified that incidents involving physical attacks on staff were examples of negative input from auditory hallucinations overwhelming Z.A.'s ability to restrain these reactions. Such incidents come "one step closer to the issue of grave disability."

Z.A. was able to name his medications appropriately and said he believed they help with the voices, and that he would continue taking them

4

on his own.  Z.A.'s responses were "very basic" and he would "basically shut down" when asked for further detail.  He said he would get his medications with help from his sister or his parents, who would give him his medications or make arrangements for them.  Z.A. did not seem "invested, interested," and did not appear to be "capable of organizing all of this on an ongoing basis" because he did not seem aware of or interested in tackling the many steps and inevitable "hiccups" in "securing your medications refills month after month."  If Z.A. stopped taking his current medications, his level of impairment would "multiply many, many fold."

Dr. Khan testified that Z.A. appeared to have a "superficial understanding" of his diagnosis and symptoms but did not appear to "really" understand or believe that "his sense of paranoia or voices in his own mind were the results of a mental disorder."  Dr. Khan explained that people with schizophrenia do not understand the hallucinations and delusions they experience are not real and, because of this impairment in insight, Z.A. reacts to the voices he hears "angrily, aggressively, or defensively," as if the voices were real.

With respect to meeting his own needs, Z.A. said he would depend on his parents for food.  He said he did not know how to cook but could "fix himself something," not seeming to understand that Khan was asking about "long-term, consistent, repetitive ability to secure food."  As to clothing, he gave the "basic, simple" answer that he has enough and if he needs more he can depend on his family or buy more.

Dr. Khan testified that the ability to secure independent shelter and accommodation is one of the most important aspects of grave disability and Z.A. had never been able to live independently.  He told Dr. Khan that he had been at Napa State Hospital for approximately one year and before that had

5

been at other mental health facilities and "mostly at [h]is parents' house, dependent on them for his living." Z.A. said he could try to rent an apartment but acknowledged that apartments can cost at least $1,200 and his Social Security would not be enough. He said he could find a job and make about $400 every two weeks, and when Dr. Khan said this did not seem to be enough to afford to live on his own, Z.A. said he would depend on his family to pay the rest. He did not have "real, viable" plans for where he would live if released to the community; he relied on the plan to stay with his parents and, "knowing that they may not take him," his sister.

Z.A.'s disorganization, confusion and poor planning led Dr. Khan to conclude he meets the criteria for grave disability in the "context of shelter." Dr. Khan explained that disorganization, paranoia and mood instability are "important and overwhelming components of schizophrenia" that "don't operate in isolation" and "basically rule a person's mind and behavior." Dr. Khan concluded that Z.A. "suffers from severe symptoms of schizophrenia, not just hallucinations and delusions, but poor organization of the thought processes. And as result of that, unable to plan for his food, clothing, and shelter."

Jamie Flores, who had been Z.A.'s conservator for about six months at the time of the hearing, related some of his statements in team meetings and individual conversations in December 2024 and March, April and May 2025. Z.A. acknowledged that he heard voices that "get to him" and cause him to get into fights;[3] said he felt overmedicated and did not like how his body

---

[3] Flores testified that at a meeting on April 15, the treatment team discussed Z.A.'s aggressive behaviors having declined since he was put on an incentive plan under which he would get a meal of his choice every two weeks with "good behavior, no physical aggression." When Flores saw Z.A. on

reacted to clozapine; and wanted to get off conservatorship. He said if the conservatorship ended, he would go to his parents' house but acknowledged being unsure whether his parents would be okay with this. Asked what he would do if he was not living with his parents, he said he did not know, then said "maybe he could live with his sister." He said he would eat the food provided at his parents' house, he did not need clothes because he already had them and for money he would have SSI (Supplemental Security Income) and get a job. Z.A. remembered some but not all of his medications and said if he needed more his parents would drive him to a pharmacy. When Flores asked if he had ever stopped taking medication, he said he had stopped in the past and ended up in the hospital as a result.

Flores saw no reason Z.A. would not qualify for a case manager if he was off conservatorship, and a case manager would be able to help with things like budgeting, finding a job, setting up SSI and other benefits, and getting to medical appointments. She had not spoken with Z.A. about possible outpatient services but she would be the person to connect him with a case manager.

On June 2, 2025, the court found Z.A. gravely disabled beyond a reasonable doubt and granted the two consolidated petitions.[4] In explaining its decision, the court emphasized that Z.A.'s records reflected numerous instances of Z.A. reporting that he was hearing voices at the time of assaultive incidents, demonstrating that even while taking his medication,

___

May 1, he had an elbow injury he said was from a fight about two weeks before with a staff member who had to restrain him.

[4] Pursuant to the court's order, the April 2024 petition would expire on June 14, 2025, and the new petition would run from June 15, 2025, to June 14, 2026.

7

his symptom of "command hallucinations" was so strong that it resulted in unprovoked "fairly violent aggressive acts."

The court granted the two consolidated petitions, the existing one that would expire on June 14, 2025, and the new one running from June 15, 2025, to June 14, 2026.

Z.A. filed his notice of appeal on June 10, 2025.

## DISCUSSION

In *Ben C.*, our Supreme Court held that "[i]f appointed counsel in a conservatorship appeal finds no arguable issues, counsel . . . should (1) inform the court he or she has found no arguable issues to be pursued on appeal; and (2) file a brief setting out the applicable facts and the law." (*Ben C., supra,* 40 Cal.4th at p. 544.) In addition, "[t]he conservatee is to be provided a copy of the brief and informed of the right to file a supplemental brief." (*Id.* at p. 544, fn. 6.) The reviewing court may then dismiss the appeal if there are no arguable issues. (*Id.* at p. 544.)

Z.A.'s appointed appellate counsel followed *Ben C.* Counsel reviewed the record, found no arguable issues and so informed Z.A.; filed her brief in this court; provided Z.A. with a copy of the brief and informed him that he could file a supplemental brief within 30 days of the filing of counsel's brief and the appeal might be dismissed if he did not do so. Counsel recognizes that we are not required to independently review the record but asks us to exercise our discretion to do so. (*Ben C., supra,* 40 Cal.4th at p. 544, fn. 7 [appellate court may choose to retain an appeal rather than dismiss it].) Z.A. has not filed a supplemental brief.

We have reviewed the record. Z.A. was represented by able counsel. Z.A. requested a court trial and waived his right to a jury trial after the court advised him of his rights. The court heard testimony from the psychiatrist

8

who evaluated Z.A. for these proceedings and Z.A.'s conservator, and carefully reviewed Z.A.'s hospital records after considering and ruling on the parties' objections to specific portions of the records. Z.A. did not present evidence. The court's decision is supported by substantial evidence.

## DISPOSITION

The order granting the consolidated petitions for reappointment of conservator are affirmed.

9

STEWART, P. J.

We concur.

MILLER, J.

DESAUTELS, J.

*Conservatorship of Z.A.* (A173819)