Filed 4/30/26  Conservatorship of H.T. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| Conservatorship of the Person of H.T. | |
| CONTRA COSTA COUNTY PUBLIC GUARDIAN,<br><br>     Petitioner and Respondent,<br><br>v.<br><br>H.T.,<br><br>     Objector and Appellant. | A174492<br><br>(Contra Costa County<br>Super. Ct. No. P2400978) |

H.T. appeals from an order granting a petition to reestablish a conservatorship and appointing the Contra Costa County Public Guardian (Public Guardian) as his conservator.  H.T.'s appointed appellate counsel filed a brief setting forth the applicable facts and law pursuant to *Conservatorship of Ben C.* (2007) 40 Cal.4th 529 (*Ben C.*).  Counsel informed H.T. that he could file a supplemental brief, but H.T has not done so.  Our discretionary review of the record discloses no arguable issues, and therefore we affirm.

## BACKGROUND

On June 13, 2025, the Public Guardian filed a petition to be reappointed as H.T.'s conservator pursuant to Welfare and Institutions Code

sections 5361 and 5362.  The petition alleged that H.T., whose conservatorship at the time was due to terminate on July 22, 2025, continued to be gravely disabled as a result of a mental disorder and unable to provide for his basic personal needs for food, clothing, or shelter.  (See Welf. & Inst. Code, § 5008, subd. (h)(1)(A).)  On August 11, 2025, H.T. waived his right to a jury trial on the petition and a three-day court trial began.

Andrew Bove, who had been H.T.'s conservator for about 13 months at the time of the trial, testified about their conversations in December 2024 and May and July 2025.

Bove first met H.T. in December 2024 at a hospital.  During the meeting, H.T. was unable to recall why he had been hospitalized.  When Bove asked H.T. about the reports from the hospital outlining his behaviors, H.T. denied them.  He said that they were exaggerations, he had not behaved in that way, and he did not understand why Bove would be saying those things.  H.T. also denied any history of hallucinations, delusions, or disorganized thoughts.

H.T. said that he did not need medication and did not think that the medication he was taking made a difference.  He also stated that he wanted to live with his parents.  H.T. then changed his position regarding medication, stating that he would continue to take medication at home.

Bove met with H.T. in May 2025 via Zoom.  H.T. was at the Modesto Residential Living Center.  H.T. again expressed his desire to live with his parents but said that he did not see the need to take medication and did not want to take it if he was returned home.  During that meeting H.T. was alert only to place and person, meaning he understood who he was and where he was residing, but he did not know the year or the name of the President of the United States.  Also, there was about a 15-second delay in his responses.

Bove asked H.T. what he would do if he was unable to move back in with his parents. He replied that he did not know what he would do but just wanted to return to his parents. He then asked if Bove was evil. This question came out of nowhere. When Bove asked H.T. why he had asked the question, H.T. could not elaborate. H.T. said that he did not believe that the medication helped him but was unable to identify any potential negative side effects of the medication. H.T. did not know the medications he was taking.

At some point during the conversation, H.T. started smiling at a time when it was not appropriate to the content of the conversation. Bove asked him what he was looking forward to if he was sent home. H.T. said, "just hanging out," then smiled. Bove believed that H.T. was responding to "internal stimuli," in that he appeared to be less engaged in the conversation with him, "appeared to have sort of gone inward," and became preoccupied and began mumbling to himself. He was no longer looking at Bove and was looking elsewhere as if he was engaged with "some imaginary other than [Bove]." There was nothing there that Bove saw.

Bove asked H.T. what he would do to obtain food if he were on his own. H.T. said that "he would get food from God." When asked the same about clothing, H.T. said he already had clothes and that if he did not have enough clothes, he would get them from staff of the board and care. He also said that if he were to go home, he would have plenty of clothes there.

Bove next met with H.T. on July 21, 2025. H.T. again expressed a desire to go live with his parents. Bove characterized H.T. speech as "pretty impoverished." There was a lack of detail in his responses, his remarks were vague, and he lacked spontaneity. Unless Bove was actively trying to facilitate information, H.T. would sit silently.

H.T stated that he was trying to get out of the board and care facility.

3

He referred to it "as feeling like jail." He also stated that he was going to see his father over the weekend and hoped that he would agree to allow H.T. to return home. He did not have a backup plan if that plan fell through. At that point, H.T. became frustrated, agitated, and abruptly ended the conversation, which had only lasted about four minutes.

On cross-examination, Bove acknowledged that during the meetings, as well as in court, H.T. looked "[f]airly well kept." At one point, H.T. said that he would not take medication but that he should.

Bove also testified that prior to being hospitalized in 2024, H.T. was living with his parents.

On re-direct, Bove stated that the prior two meetings that lasted 15 to 20 minutes ended when they did because Bove did not believe that he could keep the meetings going any longer. At the May 2025 meeting, H.T. had begun rocking back and forth in his chair and appeared to become restless and agitated, so Bove decided to end the meeting.

Dr. Shahbaz Khan testified as an expert in psychiatry and evaluation of grave disability. Dr. Khan met H.T. on July 26, 2025 at a long-term psychiatric inpatient residential facility in Modesto for 30 to 35 minutes. Dr. Khan reviewed H.T.'s medical records from present and past hospitalizations and notes from the conservator.

Dr. Khan diagnosed H.T. with chronic schizophrenia, which he described as a severe mental disorder characterized by severe disorganization of thoughts and speech, delusions and hallucinations, catatonia, and "negative symptoms" such as a lack of motivation and withdrawn affect. Disorganization of thoughts reflects "a type of confused thought process where a person is not able to maintain a[ ] logical chain of thought [and] . . . express themselves in a rational manner." Instead, the individual

4

has "bizarre ways of thinking," such as making "illogical connections" and "loose associations." Hallucinations and delusions are both impairments in reality perception. The negative symptoms can affect one's ability to complete activities of daily living, which are basic personal functions of being able to take care of grooming and hygiene, as well as ask for, and consume, food and water.

Dr. Khan described the disorder as chronic because it is a lifetime disorder that typically does not go away or subside, although it could get better with treatment.

Schizophrenia is treated with medication, psychotherapy, and psychosocial support/case management to assist the patient in becoming more independent in the community.

At the time, H.T. was taking three psychiatric medications that are commonly given as treatment for severe mental illnesses like schizophrenia. H.T. was taking Haloperidol, an anti-psychotic; Duloxetine, an anti-depressant that is not primarily used to treat schizophrenia but treats its "negative symptoms and apathy and depressive type symptoms a patient with schizophrenia can experience"; and Vraylar, a "newer and more novel anti-psychotic medication[ ]." Dr. Khan noted that Haloperidol was being phased out in favor of the Vraylar, the possible reason being that it either was not working or it might have caused side effects. Because "[i]t takes a little while for [Vraylar] to kick in," the Haloperidol would continue to be given for at least a week.

Dr. Khan began his interview of H.T. by asking his age. H.T. said he did not know. He also did not know his date of birth. This was unusual because the overwhelming majority of patients, no matter how impaired, know their date of birth and/or their age. Dr. Khan believed that was a big

5

indicator of disorganized thoughts on H.T.'s part.

H.T. denied having any mental illnesses or any diagnoses. Dr. Khan then asked him if he had ever been told that he had a diagnosis. H.T. said that no one have ever told him anything about a mental illness. He also denied ever having any prior breakdowns or mental health symptoms of any kind.

H.T. said that he had never taken medication on his own in the past and had no intention of taking medication in the future. He did not believe that there was any need for him to take medications, and they did not help him. H.T. acknowledged he was currently taking medications but did not know why or feel that they were necessary.

During the course of the interview, Dr. Khan observed that H.T. was "more flat to blunt in his affect or his general appearance of mood on his face and body" and "seemed to have a relatively rigid posture." H.T.'s "demeanor was not agitated," but he became "more and more disorganized" and appeared "unpredictable and very withdrawn." H.T.'s disorganization was exhibited by him giving either slow responses or "very quick reactive answers like 'no,'" while at other times remaining quiet and unresponsive.

H.T. denied hearing voices and having delusions, but then gave statements that were consistent with paranoid delusions. He claimed that "he was being raped by a woman who was a porno . . . actress, and that he didn't like such attack." He also said that "somebody wanted to rape him and that he wouldn't like it," and that he "tries to ignore any type of harassment that comes his way." These beliefs were consistent with paranoid delusions and delusions of persecution, which are typical of schizophrenia. It was also possible that there was an aspect of visual or auditory hallucination involved in these beliefs.

Dr. Khan asked H.T. if he was receiving Supplemental Security Income (SSI) benefits, and he said he was not. Dr. Khan also asked him about his plan for food and clothing. H.T. said that he can "secure food somehow" and he "will just eat food." He also said that he would get clothes somewhere but there was no detail or real planning. When asked about shelter, H.T. did not have a plan, other than repeating several times that he wanted to go back home and live with his parents. When asked how he got along with his parents, H.T. said, "I don't know."

Dr. Khan believed that H.T. had given no attention or thought to his future plans for independent living. Dr. Khan opined that H.T. had no credible plan for securing food, clothing, and shelter.

Dr. Khan testified that H.T. initially expressed "blunt affect" but as more time passed during the interview, he "appeared to be internally preoccupied," an observation in psychiatry referring to when individuals "respond[ ] to triggers and experiences in their own head like hearing voices or see[ing] things." As time went by, H.T. stopped giving reasonable responses to questions. It seemed like he was communicating "with unseen people or forces because he was making serious facial gestures and expressions that are consistent with conversation with someone that was unseen to [Dr. Khan] or not present with us in that interview."

At that point, H.T. stopped trying to communicate with Dr. Khan. After a few more moments of silence during which time H.T. was very active with his facial expressions, Dr. Khan ended the interview.

Dr. Khan also testified about H.T.'s past hospitalizations noted in his medical records. From May 2024 to September 2024, H.T. was in an inpatient psychiatric unit. This indicated that H.T. was "so symptomatic and unable to revert back to some amount of baseline functioning or reduction in

7

symptoms" that he "needed four months of stay in a psychiatric hospital requiring intense supervised professional care."

The records also indicated that H.T., at times, was not agreeable to taking medication. When he refused medication, he was sometimes given intramuscular injections.

The records also reflected that on May 18, 2024, a psychiatrist observed some improvement, but H.T. refused to state whether he was hearing voices. From the perspective of a schizophrenic person's mind, it made sense to refuse cooperation with treatment because he did not perceive his problems as symptoms of mental illness, but rather as outside forces persecuting him. However, on May 23, 2024, H.T. acknowledged experiencing auditory hallucinations.

In May and June 2024, H.T. was given the drug Clozapine, a very effective psychotic medication with potentially significant side effects. One of these possible side effects was severe constipation. When H.T. reported that his last bowel movement was two or three nights prior, he was advised that he needed to take another medication because it was not safe to be constipated when taking Clozapine. Because H.T. was unwilling to cooperate with treatment to address the constipation, he was taken off of Clozapine.

Dr. Khan testified to other occasions where H.T. was admitted to mental health facilities and demonstrated disruptive or disorganized behavior and a lack of insight. He also demonstrated a flat affect and poverty of speech, which indicated an impairment in his thought processes.

Based upon the medical records and his interview with H.T., Dr. Khan did not believe that H.T. had insight into his mental illness. If he were in the community, he would not continue to take his medication. Dr. Khan believed that H.T.'s schizophrenia prevented him from providing for his own food,

clothing, and shelter.  Due to his mental illness, H.T. was unable to think logically, cooperate with treatment, or make plans necessary to obtain food, clothing, and shelter.  Instead, his plans were simplistic and involved "[a]lmost magical thinking" in that "he could just go back and live with his parents without any sense of responsibility, without any sense of functionality, without any sense of higher goals and ability even to provide for his very basic care and needs like food, clothing, and shelter.  He has not demonstrated any of that."

On August 13, 2025, the court found H.T. gravely disabled beyond a reasonable doubt and granted the petition to reappoint a conservator for H.T. for a one-year period, to run from July 23, 2025 to July 22, 2026.

This timely appeal followed.

## DISCUSSION

In *Ben C.*, our Supreme Court held that "[i]f appointed counsel in a conservatorship appeal finds no arguable issues, counsel . . . should (1) inform the court he or she has found no arguable issues to be pursued on appeal; and (2) file a brief setting out the applicable facts and the law." (*Ben C.*, *supra*, 40 Cal.4th at p. 544.)  In addition, "[t]he conservatee is to be provided a copy of the brief and informed of the right to file a supplemental brief." (*Id.* at p. 544, fn. 6.)  The reviewing court may then dismiss the appeal if there are no arguable issues.  (*Id.* at p. 544.)

H.T.'s appointed appellate counsel followed *Ben C.*  Counsel reviewed the record; filed a brief in this court setting forth the applicable facts and law and identifying no arguable issues; and provided H.T. with a copy of the brief and informed him that he could file a supplemental brief and that the appeal might be dismissed if he did not do so.  Counsel recognizes that we are not required to independently review the record but asks us to exercise our

9

discretion to do so. (*Ben C.*, *supra*, 40 Cal.4th at p. 544, fn. 7 [appellate court may choose to retain an appeal rather than dismiss it].) H.T. has not filed a supplemental brief.

We have reviewed the record. H.T. was represented by able counsel. H.T. requested a court trial and waived his right to a jury trial after the court advised him of his rights. The court heard testimony from H.T.'s conservator and the psychiatrist who evaluated H.T. for these proceedings. The court carefully reviewed H.T.'s hospital records after considering and ruling on the parties' objections to specific portions of the records. H.T. did not present evidence. The court's decision is supported by substantial evidence. We discern no abuse of discretion in the court's evidentiary rulings. In sum, we find no arguable error that would result in a disposition more favorable to H.T.

## DISPOSITION

The order granting the petition for reappointment of a conservator is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

(A174492N)

11